SAVE THE NIOBRARA RIVER ASSOCI-
ATION, INC., a corporation; Wes San-
dall, Linda Munk, Tom Higgins, and
Loring Kuhre, Plaintiffs,

v.

Cecil D. ANDRUS, Individually and as
Secretary of the Department of Interior,
and Gilbert W. Stamm, Individually and
as Commissioner of the Bureau of Rec-
lamation, their employees, attorneys,
and all persons acting in concert or co-
operation with them or at their direction
or under their control, Defendants,

Niobrara Basin Irrigation District; North
Central Nebraska Reclamation District;
and State of Nebraska Board of Educa-
tional Lands and Funds, Intervenors.

No. CV75–L–96.

United States District Court,
D. Nebraska.

March 4, 1977.

On Motion to Vacate Injunction
April 16, 1979.

J. Bruce Teichman, Lincoln, Neb., Edward F. Fogarty, Omaha, Neb., for plaintiffs.

Robert F. Kokrda, David A. Kubichek, Asst. U. S. Attys., Omaha, Neb., Jeffrey A. Bogue, Asst. U. S. Atty., Lincoln, Neb., for defendants.

James L. Sedgwick, Lincoln, Neb., for intervenors Niobrara Basin Irrigation Dist. and North Central Nebraska Reclamation Dist.

Bernard L. Packett, Asst. Atty. Gen., Lincoln, Neb., for intervenor State of Nebraska Bd. of Educational Lands and Funds.

## MEMORANDUM OF DECISION

URBOM, Chief Judge.

As a preface to an injunction, the plaintiffs ask for a declaration from the court that a Final Environmental Statement (hereinafter called FES) does not state carefully enough the environmental risks of the proposed Norden Dam and Reservoir on the Niobrara River near O'Neill, Nebraska. Following an analysis of a massive amount of documentary and oral evidence presented at the trial, a decision about making such a declaration can now be made.

## JURISDICTION OF THE COURT

A federal question is presented, because the suit doubts that 42 U.S.C. § 4332(2)(C) has been complied with, and the amount in controversy exceeds $10,000.00. Jurisdiction of the court is under 28 U.S.C. § 1331(a).

## FACTS OF THE PROJECT APPLICABLE GENERALLY TO THE ISSUES

The project, technically called the O'Neill Unit, Lower Niobrara Division of the Pick-Sloan Missouri Basin Program, consists of the proposed Norden Dam and Reservoir on the Niobrara River, the O'Neill Canal, Small Canal and Lateral Distribution Systems, the Springview Pumping Plant, Forebay Dam, Forebay, and other facilities. The Norden Dam axis would be located about eighteen miles northwest of Ainsworth, Nebraska. The dam is proposed as a rolled earth-fill structure rising about 180 feet above streambed with a crest length of 3,700 feet and an embankment volume of 8,200,000 cubic yards. The reservoir would inundate approximately 6,300 acres of land, extend some nineteen miles up the Niobrara River Valley, and have a shoreline of about 70 miles.

The proposed O'Neill Canal, the major means of distributing irrigation water, would convey water from Niobrara Reservoir to the Niobrara Basin Irrigation District. The service area includes 8,000 acres in the vicinity of Springview, Nebraska, in Keya Paha County, and 69,000 acres near Atkinson and O'Neill, Nebraska, in Holt County. The capacity of O'Neill Canal would range from 6 to 1,400 cubic feet per second (c.f.s.). The first 28 miles would be concrete-lined and the remaining 72 miles would have compacted-earth lining. In addition to O'Neill Canal, which would be 100 miles long, some 262 miles of smaller canals and laterals would be required, ranging in capacity from 4 to 350 c.f.s. Approximately three-fourths of this would be improved to reduce seepage by means of compacted-earth lining.

This project has been undergoing Congressional consideration since the mid-1950s.

In June, 1953, the O'Neill Unit was included in the Niobrara River Basin development plan.

On August 21, 1954, the project was authorized by Congress (P.L. 612 [68 Stat. 757], 83rd Cong. 2d Session). In this authorization Congress required a report demonstrating physical and economic feasibility, i. e., a Feasibility Report, prior to construction.

On August 14, 1964, P.L. 442 (88th Cong.) required reauthorization by Congress of all Missouri River Basin projects not then under construction.

The Feasibility Report on the O'Neill Unit was submitted to the President on December 7, 1965, was cleared by the Bureau of the Budget without objection on May 6, 1968, and was transmitted to Congress as House Document 378 (90th Cong. 2d Session) on September 4, 1968. This report included nine appendices. The report is here as defendants' Exhibit 2 and the appendices as defendants' Exhibits 4, 5, 6, 7 and 8.

H.R. 268 and S. 1454 to authorize the O'Neill Unit were introduced in 1970 in the 91st Congress, 1st Session. Congressional field hearings were held in O'Neill, Nebraska, on July 18, 1970, before the House Subcommittee on Irrigation and Reclamation to consider H.R. 268, but the 91st Congress adjourned without further considering either of the bills.

The National Environmental Protection Act (NEPA) went into effect January 1, 1970.

A Reevaluation Statement, defendants' Exhibit 3, was prepared by the Bureau of Reclamation in April, 1971, and consisted of a supplement to the Feasibility Report, defendants' Exhibit 2.

Authorizing legislation was again introduced in the 92nd Congress, 1st Session, as H.R. 868 and S. 353. Hearings were held in Washington on March 20 and 21, 1972, before the House Interior and Insular Affairs Committee, Subcommittee on Irrigation

and Reclamation, and the Senate Interior and Insular Affairs Committee, Subcommittee on Water and Power Resources.

A draft Environmental Impact Statement was prepared by the Bureau of Reclamation shortly after passage of the NEPA. The draft was attached to the Department of Interior's legislative report to Congress and transmitted to interested federal agencies, and comments were solicited. It was transmitted to the Council on Environmental Quality (CEQ) on July 12, 1971. Although no objection to the adequacy of the draft was made by members of the House or Senate subcommittees, the Bureau of Reclamation decided to revise the Environmental Impact Statement. This revision became the Final Environmental Statement (FES), which is defendants' Exhibit 1, and was filed with the CEQ on September 22, 1972.

The project was authorized by Congress in the Reclamation Project Authorization Act of 1972 (P.L. 514, 92nd Cong.) on October 20, 1972.

The Public Works Appropriations Act of FY 1974 (P.L. 97, 93rd Cong.) appropriated $200,000.00 to begin the advance planning studies on the O'Neill Unit.

The Public Works Appropriations Act of FY 1975 (P.L. 393, 93rd Cong.) appropriated an additional $550,000.00 to continue the advance planning studies, and the Public Works for Water and Power Development and Energy Research Appropriations Act of FY 1976 (P.L. 94–130, 94th Cong.) appropriated $1,095,000.00 to start construction of the O'Neill Unit. Prior to FY 1974, when advanced planning studies began, Congress had appropriated $1,046,978.00 to finance Bureau of Reclamation studies of the O'Neill Unit. The project is now in the infancy stage of construction.

Additional facts will be cited as necessary to resolve specific issues.

## IDENTITY OF FINAL ENVIRONMENTAL STATEMENT

Because the claim is that the FES is inadequate and because environmental factors are discussed in several different documents in evidence, the issue arises as to what document or documents are to be considered in determining the sufficiency of the FES. I conclude that for purposes of this case sufficiency must be decided on the basis of that document labeled "Final Environmental Statement," which is defendants' Exhibit 1.

The defendants urge that the Feasibility Report, the Reevaluation Statement, and the nine appendices to the Feasibility Report, be considered as part of the FES, as well as any work which is cited in any footnote or in the bibliography of the FES.

The NEPA states:

"The Congress . . . directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report . . . a detailed statement . . . on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on En-

vironmental Quality and to the public . . ., and shall accompany the proposal through the existing agency review processes . . ."

42 U.S.C. § 4332

■■■ The purposes of the "detailed statement" are at least these:

1. To ensure that agency officials will be acquainted with the trade-offs which will have to be made if any particular line of action is chosen;
2. To explicate fully the agency's course of inquiry, analysis, and reasoning, thus opening up the agency's decision-making process to critical evaluation by those outside the agency, including the public;
3. To supply a convenient record for courts to use in reviewing agency decisions on the merits; and
4. To provide full disclosure to the public of environmental issues.

*Environmental Defense Fund, Inc. v. Froehlke,* 473 F.2d 346 (C.A. 8th Cir. 1972); *Minnesota Public Interest Research Group v. Butz,* 541 F.2d 1292 (C.A. 8th Cir. 1976). It is the essence of the NEPA that the detailed statement "gather in one place" a discussion of the relative environmental impacts of alternatives. *Environmental Defense Fund, Inc. v. Froehlke,* supra, at 350.

The defendants cite three cases in support of their position that all supporting documents—those referenced in the body of the statement or listed in the bibliography, as well as the Feasibility Report, the Reevaluation Statement, and the appendices of the Feasibility Report—are part of the statement mandated by the Act: *Life of the Land v. Brinegar,* 485 F.2d 460 (C.A. 9th Cir. 1973); *Trout Unlimited v. Morton,* 509 F.2d 1276 (C.A. 9th Cir. 1974); and *Environmental Defense Fund, Inc. v. Corps of Engineers of United States Army (Gillham),* 342 F.Supp. 1211, 1217–1218 (U.S.D.C. E.D. Ark.1972).

*Life of the Land v. Brinegar,* supra, does hold that failure to attach the text of all the references used in the statement's preparation does not render the statement defi-cient, where they remained available upon request. No claim is here made that the texts of all supporting documents should have been attached to the FES; the claim simply is that the FES does not adequately state the environmental facts. The case of *Life of the Land v. Brinegar,* therefore, is inapposite.

*Trout Unlimited v. Morton,* supra, similarly holds that supporting studies need not be physically attached, but must be accessible. The opinion further declares that the FES itself must not be conclusionary in nature and the public must be informed of the impacts by the statement itself. This is consistent with the holding which I now make.

The third case, *Environmental Defense Fund, Inc. v. Corps of Engineers of United States Army (Gillham),* supra, does not support the defendants' position. The case indicates only that the appendices of the FES were a part of the FES. Those appendices were not the equivalent of the separate Feasibility Report or the appendices to the Feasibility Report, but were the equivalent of the appendices of the FES in the present case, which appendices are physically a part of the FES and consist of a reservoir operations graph, excerpts from the Nebraska Water Quality Standards, a list of resident mammals, a list of resident and migratory birds, and a letter from the Nebraska State Historical Society. I agree that those items, as well as the comments from various federal agencies, the State of Nebraska, Nebraska counties, Nebraska cities, conservation entities, and newspapers should be considered to be a part of the FES. They have been physically integrated during the entire decision-making process.

The critical document, therefore, is the FES itself, including the comments that are physically a part of it. To hold that the Feasibility Report and its appendices and the Reevaluation Statement are a part of the FES would be to miss the point of Congress' requiring "a" detailed statement. Perhaps the most meaningful test is what a lay person, an interested member of the general public, needs and reasonably can

expect to have in making an informed evaluation of the environmental risks. Scattered documents, not even specifically cited in a single document for support of a particular environmental fact, do not meet that test. If a conclusion is stated in the FES and the reader is then directed to another document for data supporting the conclusion, the document to that extent should be considered to be a part of the FES, if it is accessible to all, including the public.

### LEGAL STANDARD

■ An FES is to be judged by a legal standard which seeks to be a guide to interpreting the NEPA requirement that the statement be "detailed." *Sierra Club v. Froehlke*, 534 F.2d 1289, 1299–1300 (C.A. 8th Cir. 1976), puts it this way:

" ' . . . The discussion of environmental effects need not be "exhaustive" but rather need only provide sufficient information for a "reasoned choice of alternatives." *Natural Resources Defense Council, Inc. v. Morton*, 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972). . . . Section 102(2) does not require that "each problem be documented from every angle to explore its every potential for good or ill.' "

" . . . The courts must employ a rule of reason in the examination for adequacy of these statements, lest the litigation have no end. . . .

" ' . . . The effectiveness of Section 102(2) [42 U.S.C. § 4332(2)] depends upon compliance with procedural duties "to the fullest extent possible," *i. e.*, a compliance, the completeness of which is only limited by the agency's statutory obligations. While no agency may properly adopt a less demanding standard for their effort, judicial review is based on a pragmatic standard. In determining whether an agency has complied with Section 102(2), we are governed by the *rule of reason* . . . '

"*Sierra Club v. Morton*, 510 F.2d 813, 818–819 (5th Cir. 1975)."

### SEDIMENT ACCUMULATIONS ABOVE THE RESERVOIR AND BELOW THE DAM

Sedimentation is discussed in the FES as it relates to accumulations in the reservoir above the dam, but the plaintiffs complain that there has been a lack of or inadequate discussion of accumulation of sediment above the reservoir and below the dam. The plaintiffs' position is that accumulation of sediment in the reservoir will raise the water level in the reservoir, which in turn will lessen the capacity of the river upstream to carry sediment, resulting in increased sediment accumulations far upstream from the reservoir and at the mouths of tributaries leading into the river.

Although there was testimony to support this position, I am persuaded that the factor of sediment accumulations above the reservoir is not significant and that a lack of discussion of it in the FES was warranted. No reasonable likelihood of upstream sediment accumulation has been shown by a preponderance of the evidence. The probability is that no substantial impact upon upstream deposits above the water level of the reservoir will occur, because of the narrowness of the channel and swiftness of the water.

As stated in *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (C.A. 9th Cir. 1974), a reasonably thorough discussion of "the significant aspects of the probable environmental consequences" is all that is required.

Essentially the same is true as to sedimentation below the dam. Although a diminished flow of water decreases the capacity of the water to carry sediment, the amount of water anticipated to be released from the dam would probably be sufficient to make any sediment accumulation nominal. The FES says enough at C–7, paragraph 29:

"Operation of the project will reduce downstream flows of the Niobrara River about 38 percent below historic average annual flows at Norden Damsite and 10 percent at the river mouth. The reduced flows will have some physical and biological impacts on the stream ecosystem . . .

". . . With the project development, the flows immediately below Norden Dam would be 200 c.f.s. or greater, half of the time, which is greater than the recorded minimum flows.

\* \* \* \* \* \*

". . . [R]educed flow will reduce the capability to carry sediment and silt, less scouring of sand islands in the braided portions will occur because of reduced occurrences of flood flows, and some areas will have stream bottomland exposed. . . . The establishment of new riparian vegetation and the change in the stream's pattern of cutting and depositing suspended material could change the existing meander patterns."

## APPLICATION OF HIGH HYDROSTATIC PRESSURE TO THE GEOLOGICAL FORMATIONS AT THE DAMSITE

To the extent that the plaintiffs' evidence is within the scope of the issue as limited in the pretrial order, two points are emphasized: (1) pressure of water in the reservoir against the Valentine formation is likely to cause landslides into the reservoir, and (2) pressure from the weight of the dam and weight and intrusion of water into the Pierre shale under the dam may result in an unstable foundation for the dam.

The Valentine formation is the formation nearest the top of the sides of the reservoir and consists of fine and medium sands.

■ Dr. Wilbur F. Rogers, Professor of Civil Engineering at the University of Nebraska, testified at the request of the plaintiffs that he has observed evidence of land movement within a mile above the dam and predicts that substantial slides into the reservoir will occur when it has been filled with water. None of the defendants' experts have seen what Dr. Rogers interprets as signs of instability in the reservoir area, but are inclined to dismiss the significance of whatever they are. As to the ability of the formations at the damsite itself to hold a several-million-ton dam, both Dr. Rogers and the defendants' experts agree that further studies are necessary to have assurance

of a stable foundation. Some studies are underway now. Load studies have not been done, but will be. No problems are expected by either the state geologist, Vincent Dreeszen; the Bureau of Reclamation geologist, Lynn A. Johnson; or the supervising engineer, Edward W. Gray, Jr. But the fact remains that there is evidence of instability within a few miles downstream from the dam and perhaps a lesser distance upstream, and all agree that further studies need to be done.

That need is not mentioned in the FES. I conclude that it should be.

The FES is silent on the subject of geological instability, other than stating at B–3, the second paragraph, that "no known faults exist in this area. Seismic activity is almost unknown."

As to the possibility of landslides into the reservoir, I think that the evidence is insufficient to meet the plaintiffs' burden of proof that the FES is inadequate. I do not mean that there is no danger of landslides; I mean only that the FES needs to be judged on the basis of knowledge reasonably available at the time of its preparation. The defendants' geologist made careful studies at the site and observed no evidence of landslides or other instability that would suggest a genuine risk from hydrostatic pressure against the Valentine formation, which is the issue before me. Although all interested agencies had an opportunity to comment on the draft environmental statement, no one suggested that kind of instability. It was only at the trial that this problem was brought to the attention of the Bureau of Reclamation, whose responsibility the construction is. On the other hand, the question of the safety of the damsite does not fall heir to the same facts. Uncertainty of the strength of the underlying rock and soil foundation to support the dam, given the instability known to be nearby and the hydrostatic pressures necessarily involved from the reservoir, has been present in the minds of the experts of the Bureau of Reclamation from the outset of the project. The Bureau abandoned two sites for the dam because of geologic insta-

bility before selecting the present one. It agrees that it still has not eliminated the uncertainty but now is conducting and in the future will conduct tests to do so. All this intimates a risk of danger to the environment and deserves to be taken into account by a decisionmaker in deciding whether to proceed with the dam. It therefore needs to be explicated in the FES.

I do not hold that the uncertainty must be eliminated before construction can go forward. I hold only that the uncertainty—its nature and basis and what is needed to remove it—must be expressed in the FES so that a decisionmaker may weigh it on the scales. Otherwise, the FES will not be providing a "reasoned choice of alternatives" within the "rule of reason."

## WATER QUALITY

The plaintiffs assert that the FES is insufficient in that it fails to provide enough information about the project's impact on the groundwater quality and misrepresents technical papers directed to nitrate pollution issues.

There can be no doubt that increased farm irrigation and livestock production generally tend to increase the pollution of groundwater. The project is expected by the defendants to increase the production of livestock and the use of irrigation. What effect would these increases have on the quality of the groundwater in the area?

In order to describe the anticipated impact of the project, the FES must describe the quality of the water as it is before the construction. It does this at C–3, paragraph 11, as follows:

"An analysis of water quality in the Niobrara River Basin indicates a range in total dissolved solids (TDS) of 172 milligrams per liter (mg/l) to 208 mg/l and an average of 190 mg/l."

Similarly, at B–4 the FES says:

". . . The present quality of surface water in the Niobrara River at Norden Damsite is good. The total dissolved solids average about 190 ppm with a range of 170 to 210 ppm. Surface water in the project service area has slightly less TDS.

Under Nebraska's water quality standards, this reach of the river is classified 'A, C.' Excerpts from the *Water Quality Standards* describing these classifications are appended.

". . . Reports of high-nitrate water from several wells in northern Holt County [one of the counties in the project area] prompted the U. S. Geological Survey to look into the problem. . . . [W]ater samples were obtained from 71 wells during the period 1963 through 1966 . . . Sampling was . . . concentrated on known problem areas. Twenty-two of the wells sampled contained more than 45 ppm nitrate, the recommended upper limit for domestic water supply. Nitrate in all samples ranged from 0.1 to 409 ppm. A report on the survey . . . in Holt County was published by the Conservation and Survey Division of the University of Nebraska."

Citation of the report is given at that point in the FES as a footnote, and the report is quoted:

"When the nitrate concentrations are plotted on a map, it is apparent that the high and low values are randomly distributed.

"A likely source of contamination could be identified for nearly all the stock and domestic wells yielding high-nitrate water. Not surprisingly, barnyards and feedlots were the principal offenders, as several of the high-nitrate samples were from wells near or within such tracts. Buried sources, such as septic tanks and sewage outlets, were suspected for those not having obvious sources.

". . . [A]lthough a relation between the use of nitrate fertilizers and high nitrate concentrations in ground water has not been established, it seems likely that one may exist."

Contrary to the position of the plaintiffs, the FES does not misrepresent the quoted study, known as the Engberg report. The FES does not picture the report as applying generally to Nebraska, but specifically iden-

tifies it as relating to Holt County. Neither is there a misrepresentation of another study, this one by Seim, Mosher and Olson, quoted at B–5. That study does relate to Nebraska generally, not to the project area specifically, and no careful reader of the FES would be led to think otherwise.

The conclusion at B–6 of the FES is that ". . . a nitrate problem exists in many areas in Nebraska . . . The problem will require additional monitoring, study, and research in the O'Neill area." That conclusion is accurate and supported by the cited studies.

As to the effect the project will have on water quality, the FES says little. At C–3 is this:

"There will be an increased use of herbicides, pesticides, and fertilizers on private lands served by Reclamation projects. However, Reclamation does encourage sound farming and irrigation practices related to the use of these items. According to the Federal Water Pollution Control Administration letter of February 20, 1970, appended to the 1971 reevaluation statement for the O'Neill Unit, the increase in salinity in the Niobrara River is not expected to exceed the criteria specified by the Water Quality Standards. . . ."

The referenced letter does so indicate, but the letter at that point was discussing the salinity *in the Niobrara River*, not increased TDS in the groundwater. The letter acknowledges that "livestock production has grown to be a very significant agricultural activity in the study area and is expected to increase with the availability of feed from irrigated land." The letter states that cattle feeding results in the production of substantial amounts of wastes and concludes that "confined cattle feeding operations can be adequately controlled by the State to minimize the effects of this potentially large waste load."

The only other statement in the FES about the effect of the project on the groundwater is on page 3 of a response by the Bureau of Reclamation to comments of March 15, 1972, submitted by the Environmental Protection Agency to the draft environmental impact statement (in Comments from Federal Agencies in the FES):

"The potential for introduction of pesticides and fertilizer chemicals into the ground water and streams of the O'Neill area is recognized. Because of lack of basic research and documentation of this hazard in this or other areas it would be premature at this time to predict such an occurrence. Studies now in progress such as investigation of nitrate movement in soils and into the ground water by the University of Nebraska may shed additional light on this hazard prior to construction of the project."

From the totality of the evidence, I conclude that the description of the expected impact of the project on the groundwater quality is inadequate. The conclusion that the impact will be minimal was not based on scientific studies and, indeed, appears to have been based on a lack of them. The Bureau's responsibility was to discuss fully all significant environmental impacts, and it could not justifiably conclude that an impact would not be significant merely because the Bureau lacked information about the subject. Making studies would not have been of inordinate difficulty, so a duty devolved upon the Bureau to make them. Compare *United Family Farmers, Inc. v. Kleppe*, 418 F.Supp. 591, 599 (U.S.D.C. S.D. 1976).

On the other hand, the discussion of the impact on the water quality below the proposed dam—that is, the impact on stream water—is adequate. At C–3 the FES says:

". . . According to Federal Water Pollution Control Administration letter of February 20, 1971, appended to the 1971 reevaluation statement for the O'Neill Unit, the increase in salinity in the Niobrara River is not expected to exceed the criteria specified by the Water Quality Standards. An analysis of water quality in the Niobrara River Basin indicates a range in total dissolved solids (TDS) of 172 milligrams per liter (mg/l) to 208 mg/l and an average of 190 mg/l. Consumptive use of the applied water will

concentrate the salts and result in return flows that average about 320 mg/l. Reservoir bypasses and seepage that returns to the river and sectional inflow will provide sufficient riverflow to moderate the effect of the slightly more saline irrigation return flows. Since irrigation return flows would constitute only about 10 percent of the total depleted runoff in this section of the Niobrara River, the increase of TDS in the residual flows would be small."

The evidence supports this description and it was enough upon which to base a reasonable conclusion.

## OUTMIGRATION

■ An attack is made on the FES on the theory that the FES represents that the project would abate or tend to reduce outmigration without factual basis for the representation. The defendants state the issue in terms of whether there has been a misrepresentation, but either way the plaintiffs do not prevail.

Outmigration appears as a subject in the FES in the following ways:

1. In Chapter A, "Description of the Proposal," page A–7, the FES says:

". . . In this area, the population declined from 39,363 in 1940 to 33,606 in 1950, 30,602 in 1960, and 27,371 in 1970. . . . Outward migration has hindered local businesses. . . ."

2. In Chapter B, "Description of the Environment," page B–13, paragraph g(2), "Economic Development," the FES states:

". . . [R]ural population is decreasing because of increased farm size required to maintain a viable family farm enterprise . . . Population in the five-county area . . . decreased over 18 percent between 1950 and 1970. . . ."

3. On the next page, B–14, paragraph g(3), "Cultural and population centers," the FES says:

". . . In spite of the overall population loss in the O'Neill Unit area, three of [the] towns, Atkinson, Ainsworth, and

O'Neill gained population during the period 1960 to 1970. All are in areas with expanding irrigation development."

4. In the same chapter, under the heading, "Probable future environment with project," page B–15, paragraph 2, is this statement:

"Economic pressures on primary and secondary agriculture production in the project service area will continue [in the absence of the proposed project] to augment the trends of consolidating small farms into larger units and force an outward migration of rural residents to large urban centers . . . The population would continue to decline. Business . . . will continue to decline because of the . . . outmigrating population."

5. In Chapter H, headed "Alternatives to the Proposed Action," paragraph 1, appears the statement that "The no-development alternative would result in a project area . . . progressively degrading in . . . outmigration of the population," and spin-off effects would include "(1) consolidation of farm lands into larger units, . . ." and "(5) an outward migration of rural people to urban areas will continue."

6. In a letter from the Sierra Club-Bluestem Group of March 13, 1972 (appearing in the FES in the section labeled "Comments from conservation entities,") this statement to the Bureau of Reclamation was made at page 2, paragraph A2:

"It is highly unlikely that the O'Neill Unit and its local economic input will significantly affect the rate of rural outmigration from the project area. Similar reclamation projects cannot be shown to have done so elsewhere in Nebraska. It is neither clear that out-migration from rural areas is necessarily bad nor that such out-migration should serve as a need by which to justify developments such as the O'Neill Unit."

The Bureau's response, at IIA, paragraph 2, was:

"In discussion of the effect of the proposed project on population changes, the entire local area, including adjacent

towns, is considered as the project area. Outmigration from such an area results mainly from the absence of sufficient economic activity to sustain the existing population at a level reasonably comparable to other areas. Some may question that irrigation development will stop the present trend to larger farms and consequently the reduction in numbers of people on the farms. Water resources development does improve greatly, the potential for maintaining a viable farm enterprise without increasing the farm size. Further, the increased production and the resulting economic impact on the rest of the local community provide business growth and expansion to support absorption of excess population from the farms, particularly from those areas still without irrigation service."

7. Within a letter from the Quality Environmental Council of March 13, 1972 (in the FES in the section labeled, "Comments from Conservation Entities"), is this comment at paragraph 25:

". . . The basic reason why population in this region has declined somewhat is because of an increasing ability through technological advances for fewer people to farm or ranch more acres. Transportation is faster and agricultural machinery is more efficient. Thus, one farm family can farm 300–600 acres today whereas in 1940, few farmers utilized more than 200 acres. Ranchers can handle more acreage because of better transportation.

"By simply providing another source of water, the population is not going to increase. As we will discuss more thoroughly later in this document, perhaps as many as one-fourth of the farmers in the reclamation district have already provided their own source of water through central-pivot irrigation. The benefits to the economy will be for those who make pipe for irrigation. However, industries are already manufacturing central-pivot irrigation systems. Others to benefit will be the large farm equipment manufacturers with their base of operations outside of Nebraska. Instead of drawing human population back to the O'Neill region of Nebraska, it will be more likely to draw some of the young people to the industries outside of Nebraska."

The Bureau's response was:

"Population figures quoted in the impact statement are for the five-county area encompassing the O'Neill Unit, Holt, Keya Paha, Cherry, Brown and Rock Counties.

"Because ground-water supplies are inadequate to support anything approaching full irrigation, another source of water is necessary to maintain and enhance the farm and agriculturally-associated economy of the area. This is mandatory if this area is to maintain a stable population in the rural area.

"Certainly, as is pointed out in these comments and in the environmental statement, a large part of the economic impact of the production from irrigation occurs in agriculturally-related business. According to the findings of the University of Nebraska, 60 percent of the irrigation-related business activity occurs in Nebraska and contributes to personal income so necessary to maintenance of a stable or growing population."

At the trial the plaintiffs' expert, Bruce Johnson, agreed that rapid increase of irrigation in the area already has decreased the trend toward outmigration and he doubted that the project would have a significant impact on the trend. This is basically the position asserted by the Sierra Club Bluestem Group in its letter. The various positions on the subject of outmigration, then, were fairly set out in the FES, which includes the comments of the conservation entities and the Bureau of Reclamation responses. Trial testimony gave credence to the several opposing positions and each position is reasonable. Under those circumstances, a clear set of alternatives was afforded to the decisionmakers, and that met the primary purpose of the environmental statement.

There was a factual basis for an implied suggestion—no express representation is

made in the FES—that the project would tend to reduce rural outmigration. The Bureau recognized that opposing viewpoints exist, but one permissible viewpoint was, and is, that increased availability of irrigation water would increase irrigation, which would increase the capability of a farm unit, whether small or large, to supply more people than otherwise (not necessarily people residing on the farms but residing in the five-county area, both in towns and on farms) and thus retard the migration from the five-county area, which migration is in part economically based. The fact that opposing arguments can be made does not obliterate that permissible viewpoint.

### ECONOMY OF THE REGION

■ The issue here is whether the FES misrepresents or omits significant facts in describing the economy of the area to be served by the proposed project.

Two major points are underlined by the plaintiffs: The use of "underemployment" as an economic indicator, while omitting other indicators, and reliance upon a report by Theodore R. Roesler, F. Charles Lamphear and M. David Beveridge titled, "The Economic Impact of Irrigated Agriculture on the Economy of Nebraska," appearing in *Nebraska Economic and Business Report*, No. 4, September 1968, published by the Bureau of Business Research, University of Nebraska, footnoted in the FES at C–2.

At B–13 the FES recites that the project area is dependent upon agriculture and has a declining population. The FES then continues:

" . . . [T]he overall economy of the area has lagged . . . According to a study by the Department of Agriculture, the median income for the five-county area in which the facilities for the unit would be located was 60 percent of the national median income for 1960. Stated otherwise, the measure of underemployment in the O'Neill Unit area was 40 percent greater than the national average."

"Underemployment" is used again at A–7: "Economic underemployment of the civilian labor force averages 40 percent for the five-county area encompassing the O'Neill Unit. Evidence of the severity of this underemployment is demonstrated by a 10 percent loss in population between 1960 and 1970. In this area, the population declined from 39,363 in 1940 to 33,606 in 1950, 30,602 in 1960, and 27,371 in 1970. Communities in the O'Neill area are dependent on the economic and social base supplied by agricultural production within the immediate vicinity. Outward migration has hindered local businesses. Consequently, the O'Neill area has a lagging economy with severe underemployment."

From the quotation at B–13 it is evident that "underemployment" as used in the FES means a condition wherein the median income of a specified area, the five-county area, is less than the national median income. Although this is not the definition with which the plaintiffs' expert, Bruce Johnson, was familiar, it is not a definition foreign to the United States government economists. The Economic Development Act of 1965, 42 U.S.C. § 3121 ff., uses the term to apply to areas which have a median family income not in excess of 50 per cent of the national median, and directs that data regarding underemployment shall be used in determining whether to make grants and loans to specific regions. Indeed, as a part of the Congressional findings and statement of purpose, Congress declared that "substantial and persistent unemployment and underemployment cause hardship to many individuals and their families, and waste invaluable human resources; to overcome this problem the Federal Government, in cooperation with the States, should help areas and regions of substantial and persistent unemployment and underemployment to take effective steps in planning and financing their public works and economic development . . . "

Furthermore, a publication of the United States Department of Agriculture, "Underemployment Estimates by County, United States, 1960," plaintiffs' Exhibits 13 and 13A, described a concept similar to that

used in the FES. It compared "the reported county median income with an imputed county median income which reflected the earning capacity of the county labor force if county incomes were the same as for the national labor force with similar earning characteristics . . . If the reported earnings were lower than the adjusted norm, the county labor force was considered underemployed."

Use of the concept in the FES cannot be considered to be improper. The FES was clear enough as to the definition of the term as it was being used.

The plaintiffs argue, further, that even if use of "underemployment" was not misleading, other economic indicators should have been included, such as per capita income, unemployment, and farm assets. From the evidence I conclude that inclusion of these economic indicators would be proper, but that their omission is not improper. The plaintiffs have not carried their burden of showing that the FES is inadequate in describing the economy of the region in terms which omit per capita income, unemployment, and farm assets.

In putting together the FES the Bureau relied on a study by three economists, Roesler, Lamphear and Beveridge. Accurately, the FES states at C–2 that the study "indicates that $6.68 of economic activity occurs within the State of Nebraska for each dollar of increased value attributable to irrigated crop production." The FES then applies that formula to the O'Neill Unit and concludes that the irrigation development would result in increased economic activity of $67.5 million annually within the State of Nebraska. The plaintiffs attack the validity of that study.

It will suffice to say that the Bureau of Reclamation economist, Samuel James Kennedy, testified in support of the Roesler, Lamphear and Beveridge study, as did Dr. Leslie Floyd Sheffield, an agricultural economist. Taking the evidence as a whole, I conclude that the plaintiffs have not carried their burden of proving that reliance on the cited study was improper.

## ECONOMIC BENEFITS AND COSTS

■ The precise issue framed in the pretrial order at paragraph 14 is: "Whether the defendants were required to provide information regarding the economic benefits and costs of the proposed project."

The National Environmental Protection Act's language does not require economic benefits and costs to be included in an environmental statement. No case has been found to say that it does. I can think of no reason for requiring it. The answer to the question within the issue is in the negative.

## AGRICULTURAL LOSS

This issue is directly related to the immediately preceding issue, inasmuch as it has to do with economic benefits and costs. Broadly stated, the question is whether the FES fails to set forth adequately the amount of agricultural production lost and destroyed by the project, including the cost of interference with farming and ranching operations. The question does have environmental implications, and I therefore shall deal with it.

To the extent that the issue is one of economic benefits and costs, the FES is susceptible to the criticism that it unnecessarily deals with such matters. I have already pointed out that economic costs and benefits are not required to be in an environmental statement. The trouble is that the makers of the FES did not take that view. Indeed, a commenting letter from the United States Environmental Protection Agency, dated March 15, 1972, (appearing in FES at "Comments from Federal Agencies") questioned the propriety of emphasizing the economic and social benefits in an environmental impact statement, but the opinative response of the Bureau was that "full consideration of the economic and social environmental impacts is completely warranted." The reasons given were that all factors have to be considered by the federal government in assessing a project. So, of course, all factors should be considered, but that is not to say that they should be all detailed in the FES.

The plaintiffs then rightly assert that if economic factors are delineated in an FES, they should be fully and objectively described. Economic factors were developed in much detail for Congress in the Feasibility Report, defendants' Exhibit 2, and the Reevaluation Statement, defendants' Exhibit 3. They belong there. It would have been entirely consistent with the NEPA for the FES to have made the statement that economic benefits and costs are set out in detail in the Feasibility Report and the Reevaluation Statement and let it go at that. Having gone into the economic subjects somewhat in the FES, the question then is whether the subject was so lopsidedly treated as to be misleading.

I have tried to assess each of the many points raised by the plaintiffs in this regard, but I shall not detail them here. I conclude that the FES is not inadequate or misleading with respect to agricultural losses from an economic standpoint. This is true in part because all the arguments, I believe, and most of the evidentiary points urged by the plaintiffs, are set out in more or less detail in the FES. They are contained either in "Comments from Federal Agencies," "Comments from Conservation Entities," or the responses of the Bureau to those comments. See, for example, the Sierra Club-Bluestem Group's letter of March 13, 1972, to the effect that there already is an overproduction of corn; the letter of the Sierra Club-Pine Ridge Group of March 13, 1972, doubting that the irrigable land is "high quality" and questioning the cost-benefit ratio, and which raises the criticism that the FES excludes project-induced farm investment costs, includes unemployment benefits, excludes family-labor and management costs and the relationship between crop yields, costs and prices; and the letter of the Quality Environment Council, saying that the cost of the project would be $1,486.00 per acre for the 70,000 acres not now being irrigated, whereas irrigation with central-pivot systems is $150.00 to $250.00 an acre, declaring that the project would take out of production 30,350 acres of crop and grazing lands, and attacking the cost-benefit ratio. All these are part of the

FES and it cannot be said, therefore, that they were not taken into account by the decisionmakers.

Additionally, the FES, aside from comments from other agencies and groups, points out agricultural losses in a fair sense, although not in substantial detail. It says at page ii, paragraph 3-C:

"The reservoir . . . will regularly inundate nearly 6,300 acres of land . . . , and . . . displace six farm families . . . ."

On the same page at paragraph 3-D, it says:

"Construction will cause temporary scarring, destruction, and alteration of the existing landscape . . . ."

At C-8, paragraph 31, the FES notes that construction of the canal, laterals and drains would remove land from agricultural production and be disruptive to present farming operations. The amount of land is not there specified, but in the Bureau's response to a comment of the Quality Environment Council (with its letter of March 13, 1972, at paragraph 47) the Bureau agrees that the project would take out of production 30,350 acres of crop and grazing land for right of way. The FES at C-9, paragraph 33, says that the transmission line for the substation near Ainsworth would be constructed through grazing land and some crop land, requiring a minimum easement of 25 feet. It says that structures would be near fence lines to minimize interference with farming but that there would be some inconvenience.

All in all, I cannot say that the agricultural loss, viewed from an environmental posture, is inadequately or inaccurately stated in the FES. A contrariety of views is set out in the comments of the agencies and those views were before the decisionmakers.

### RECREATIONAL ATTRIBUTES

The issue as stated in the pretrial order is: Whether the recreational attributes were properly represented in the [FES] as a project benefit.

The FES at page ii, paragraph 2, states:

"The project will . . . increase water-oriented recreation opportunities . . . ."

Paragraph 3A on the same page says: "The proposed project will provide . . . water recreation opportunities . . . ."

Page A–4 recites planned recreational facilities and a table of them appears at A–5. One of the purposes of the project is stated at A–6, paragraph 2, as "providing water-oriented recreation opportunities . . . " Page B–15 says that, if no project were to be developed, there would be a lost opportunity "for recreation." At H–1 a statement is made that if the project were not developed, there would be left an unsatisfied need for "diversified water-oriented recreation opportunities."

Thus, there can be no doubt that the basic FES pictures the project as enhancing recreational opportunities.

The plaintiffs press several points: That the project would damage canoeing opportunities, that the projection in the FES that 300,000 visitor days annually by the 15th year of operation (C–3, paragraph 10) is factually unsupported, that the FES should acknowledge that the Norden reservoir would be located about 300 miles from the major urban centers of Nebraska, and that there really is no need for recreational facilities in the area where the project is proposed to be located.

As to canoeing loss, it is clear that the unobstructed length of river for canoeing would be reduced. About 46 miles would remain available, 12 miles of which would be downstream of the completed project. But the FES acknowledges that this is true. At B–10 it describes the present canoeing usage, as follows:

" . . . Canoers normally enter the river at Valentine and canoe through the Fort Niobrara National Wildlife Refuge to the vicinity of Smith Falls above the upper reaches of the proposed Norden Reservoir. Some canoeing is done below this point with the stream being suitable, at least part of the time, for this purpose for about 11 miles into the proposed reservoir site, except for occasional rocky ledges which sometimes damage canoes. Below this point, the river becomes more braided, making it less suitable for canoeing purposes. Although recently much publicity has been sought by certain groups for this activity, it still represents a relatively few visitor-days of use."

The FES states directly that 19 miles of the Niobrara River (page ii, paragraph 3–C) would be inundated for reservoir purposes. From that it is obvious that the reservoir would not be available for canoeing in moving water.

The projection of 300,000 visitor days to the site is not without support. It is true that the source of the information is not pointed out in the FES, but it need not be. The testimony of Kenneth R. Krabbenhoft and the Reevaluation Statement, defendants' Exhibit 3, in the last section thereof, provide the data from which an estimate reasonably could be made of the projected 300,000 figure. Even though the Reevaluation Statement is not a part of the FES, it and therefore the supporting data for the FES's statement were accessible to the decisionmakers, the commenting agencies, and the public upon request. The plaintiffs have not shown that the projection is factually unsupported.

The fact that the reservoir would be some 300 miles from the large population areas of Nebraska is pointed out in the FES in a letter from the Sierra Club-Bluestem Group of March 13, 1972, page 2, paragraph B–2. Similarly, the claim that there is no need for additional recreational facilities in north central Nebraska is made in that same letter from the Sierra Club-Bluestem Group, as well as the Sierra Club-Pine Ridge Group's letter of March 13, 1972, and the comments with the letter from the Quality Environment Council of March 13, 1972, at paragraph 32.

■ It was not unreasonable for the FES to represent recreational attributes as a project benefit, although arguments to the contrary could be, and were, made in the comments to the draft environmental statement, which are a part of the FES.

### WILDLIFE

The FES envisions the project as a source of enhancement of wildlife. It says at page ii, paragraph 2, that "The project will . . . promote fish and wildlife conservation . . . ," and at A–6, paragraph 2, that the project will provide "wildlife protection and management facilities . . . ."

At C–4, paragraph 15, it says:

"The 28-mile concrete-lined section of the proposed O'Neill Canal will be a hazard to wildlife, especially deer."

At D–2, paragraph 1, it is said that measures to reduce hazards to deer and other wildlife as a result of the concrete lining of the canal "would be studied . . . ." It says that the Bureau is experimenting and studying techniques for providing safe crossing and means of escape from the canal and that fencing would be provided as recommended by federal and state game management agencies.

Two cardinal points predominate in the plaintiffs' position. One is that the FES does not confront successfully the fact that it cannot assure a solution to the problem of deer falling into the canal. The other is that the FES is wanting in facts about the amount of wildlife that would be lost and displaced by the dam and reservoir.

With respect to deer in the canal, the difficulty of solution is admitted in the FES. It says that the canal will be a hazard to deer, that techniques are being experimented with by the Bureau for providing safe crossings, and that fencing will be furnished. In a response by the Bureau to a comment from the Nebraska Game and Parks Commission in its letter of September 10, 1971 (in the FES at "Comments from State of Nebraska"), the Bureau said:

"The hazard of conrete-lined [sic] canals to deer that get in the canals is well known. Possible solutions are fencing the canals, providing steps on the sides, and uneven or rough concrete sides. Prior to construction, the Bureau of Sport Fisheries and Wildlife has offered to consult with us in designing an effective device to reduce or eliminate this possible hazard to deer."

These statements acknowledge the persistence of the problem and offer mitigating choices. The FES is not defective in that respect.

The coverage of the project's impact on wildlife in the inundated area is quite another matter. Aside from a claim that the project will provide wildlife protection and conservation, almost nothing is said about the wildlife to be affected by the dam and reservoir, except the following statement at E–1:

"Nearly 6,300 acres of terrestrial and some avifauna wildlife habitat will be inundated. The wildlife occupants of the reservoir will be displaced. Depending on available substitute habitat, some species may decrease in number. The magnitude of loss cannot be determined because of the lack of wildlife population data and an adequate inventory of the quantity and quality of available wildlife habitat. Furthermore, by the time construction would begin, the present conditions could substantially change."

Although the plaintiffs' brief dubs this paragraph Orwellian Newspeak, I view it in less opprobrious terms. The paragraph does not strike me as being sinister or callous, but neither is it very informative. It says that about 6,300 acres of land will be under water, that the animals and birds who live there will have to go someplace else, and that how many live there now, what kinds live there now, and how many can survive someplace else is not known.

Nobody denies that the impact of this project on wildlife would be consequential. Does saying that the amount of the impact is not known constitute "to the fullest extent possible" "a detailed statement . . . on . . . any adverse environmental effect," as mandated by NEPA? It does not, at least where, as here, a reliable estimation of the effect on wildlife could have been developed by ordinary measures.

From the testimony it is clear that a census of the various species of wildlife and data of the habitat in the affected area are

needed and can be acquired fairly readily. A correlation of the pre-construction wildlife population with the present habitat needs to be made. An analysis of the present habitat and the proposed post-construction habitat should be made to compare their capacities to maintain the species and to determine the degree of likelihood that those species would find their way to the proposed habitat. By that technique, apparently, the effect of the project on the wildlife can be predicted with a fair amount of accuracy. Because none of this is done in the FES, the FES fails. Compare *Sierra Club v. Froehlke*, 534 F.2d 1289 (C.A. 8th Cir. 1976).

### *ALTERNATIVES TO THE PROJECT*

The FES at H–1 through H–3 discusses these alternatives:

(1) No development of the project,

(2) Development of groundwater for irrigation, and

(3) Other alternative facilities and purposes.

Under (1), the statement is principally a recapitulation of the benefits believed to be derived from the project stated negatively—a declaration that the benefits would not be obtained, if the project were not developed.

Under (2), the FES states that the groundwater table has been declining, while well irrigation has been increasing, and concludes that the present groundwater supply could not adequately supply the 77,000-acre service area of the proposed project without jeopardizing the quantity and quality of the remaining groundwater. This appears to be the same alternative as (1), because it amounts to no development of the project and anticipates irrigation in the same manner as in the past.

Under (3), these alternative features are discussed: Power storage, flood control

storage, additional irrigable areas, alternative reservoir sites, increasing the conservation storage capacity of the reservoir, and floodplain zoning.

The foregoing discussions are not challenged by the plaintiffs, except by disagreeing with the conclusions and factual foundations of the asserted benefits of the project. Those challenges have been set out in previous sections of this memorandum and need not be recounted.

Additionally, the plaintiffs press the thought that additional alternatives should have been explored in the FES.

Title 42 U.S.C. § 4332(2)(E) requires that the agency "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." The applicable guidelines of the Council on Environmental Quality (submitted by the defendants as Exhibit 10), appearing in Federal Register, April 23, 1971, state that:

"A rigorous exploration and objective evaluation of alternative actions that might avoid some or all of the adverse environmental effects is essential."

Such alternatives are not limited to those within the existing authority of the responsible agency.

Several possible choices are mentioned in the plaintiffs' various briefs, but only one was sufficiently supported by evidence at the trial to merit consideration.[1] It is the alternative of using the project funds, some $160 million, or a portion thereof, to develop methods of improving livestock and crop production. If that could be done sufficiently, it is possible that water usage for irrigation could be reduced enough to allow normal groundwater reservoirs to accommodate the crops without a dam across the Niobrara River. Admittedly, the FES does

---

1. There was testimony by Bruce Johnson, one of the plaintiffs' experts, about the alternative of using the project's funds for making direct welfare payments to the residents of the affected area, but I do not include that as an alternative worthy of further thought. The plaintiffs' briefs appear to offer it as a counterforce to any suggestion by the defendants that the area is poverty-stricken. I do not interpret any of the defendants' positions in the FES or at the trial as being that there is a problem of poverty in the area.

not touch that alternative, and no study by the defendants has been made to determine whether it is a viable alternative. While this alternative may or may not offer promise, it deserves discussion in the FES, because it conceivably could satisfy the primary purpose of the project with friendlier environmental consequences.

This is not contrary to *Trout Unlimited v. Morton*, 509 F.2d 1276 (C.A. 9th Cir. 1974), which says:

"The range of alternatives that must be considered need not extend beyond those reasonably related to the purposes of the project."

The primary purpose of the O'Neill Unit is to provide economic stimulus and stability to the region of the project. That the present proposal seeks to do that through added irrigation does not make irrigation, as such, a purpose of the project.

Although the defendants cite *Iowa Citizens for Environmental Quality, Inc. v. Volpe*, 487 F.2d 849 (C.A. 8th Cir. 1973), to support their position that the alternatives discussed are sufficient, that case is not helpful to them. There, alternatives were almost nonexistent and any alternative had environmental consequences as great as and almost identical to those of the project itself. Thus, the court's saying that "notice of environmental consequences is all that is required" and that "The question to be asked is whether all reasonable alternatives to the project have been considered, even if some were only briefly alluded to or mentioned" does not suggest that alternatives which under the evidence may be viable need not be discussed at all.

### VAGUENESS

▮ One final issue is presented: Whether the defendants published an FES insufficiently detailed, too vague, too general, and too conclusional to form a basis for responsible evaluation and criticism.

Although each of the attacks of the plaintiffs on the FES is bottomed in part upon the claim that the FES is too vague, I take this present issue to be a frontal attack on the language employed in the FES as a whole.

Dr. Raymond P. Tripp, Jr., a professor of English at the University of Denver, testifying on behalf of the plaintiffs, found the FES to have a "rhetorical tone," to have "highly connotative, euphemistic, vague, and rhetorical linguistic usage," and to contain a sufficiently high proportion of "persuasive, connotative language . . . [to provide] valid grounds for challenging its scientific objectivity and the nature of its communicative intent." He said that in general "the positive features attributed to the project are played up and the negative features played down."[2]

That analysis is accurate. Matters of clarity and specificity aside, the FES is no model of objectivity.

In *Environmental Defense Fund v. Corps of Engineers of the United States Army*, 470 F.2d 289 (C.A. 8th Cir. 1972), the court rejected the plaintiffs' contention that NEPA requires agency officials to be subjectively impartial. It held rather that the test of compliance is "one of good faith objectivity rather than subjective impartiality." 470 F.2d at 296. See the discussion thereon in the district court's opinion, 342 F.Supp. at 1218–1224.

I do not find, however, that the deserved censure of the FES means that large segments of the FES must be reworked linguistically in order to pass the test of NEPA. If those parts which I have found deficient in earlier parts of this memorandum are rewritten satisfactorily, the broader criticism of its language, while still valid, cannot reasonably demand more. An FES is for decisionmakers and interested members of the public, who are presumed to have reasonable astuteness to see euphemistic, rhetorical and connotative language for what it is. Granting them that, what they need is "only sufficient information to per-

---

**2.** These quotations are from Dr. Tripp's report, which is a part of filing 40 in the court file. His testimony was supportive of this summary.

mit a reasoned choice of alternatives." *Minnesota Public Interest Research Group v. Butz*, supra, 541 F.2d at 1300. They will have that, if the few inadequacies here pointed out are remedied.

### RELIEF

The plaintiffs have asked for a declaratory judgment and an injunction. They are entitled to both.

## ON MOTION TO VACATE INJUNCTION

Eleven days of hearings on the motion of the defendants and intervenors to vacate this court's injunction dated March 4, 1977, as amended by the order of April 13, 1977, were concluded on March 3, 1979.

As at the 1976 trial, the sole question is whether an adequate statement of the impact on the environment has been issued by the Bureau of Reclamation, as required by the National Environmental Policy Act, regarding the O'Neill Unit (the project). This court's only responsibility is to resolve that question in accordance with the expressions of the Congressional Act, entirely divorced from the merits of the project. Whether a dam across the Niobrara River should be built or not is of no concern to the court; that is to be decided by others. My role is to judge whether adequate information has been given those decisionmakers through the statement of the impact on the environment to enable them reasonably to make a decision on the environmental effects of the project.

### BURDEN OF PROOF

At the 1976 trial the burden was upon the plaintiffs to establish by the greater weight of the evidence that the FES (Final Environmental Statement) was not adequate under the law. They carried that burden as to four features of the FES. They demonstrated that the FES:

a. Did not describe the risk of possible danger from geological instability at the damsite of the project and the need for scientific studies of that risk;

b. Did not predict upon the basis of scientific studies an effect or lack of effect of the project on the groundwater quality in the region of the project;

c. Did not detail upon the basis of scientific studies the anticipated impact of the project on the wildlife in the area of the proposed reservoir; and

d. Did not assess, as an alternative to the construction of the proposed dam, a program of researching techniques for improving livestock and crop production without diminishing groundwater reserves by irrigation.

To correct these inadequacies the Bureau of Reclamation has prepared and circulated a Final Environmental Statement Supplement and four appendices, collectively called herein the FESS (defendants' Exhibits 101, 101A, 101B, 101C, and 101D). Each appendix addresses a specific area of inadequacy in the FES, and the supplement itself, defendants' Exhibit 101, summarizes the four appendices.

The judgment enjoining the project is to stand, by its own terms, until the four areas of inadequacy have been corrected. The defendants and intervenors now ask via a motion under Rule 60(b)(5) of the Federal Rules of Civil Procedure to be relieved of the injunction because they have made adequate in the FESS the areas deemed inadequate in the FES. The burden of proof is on the defendants and intervenors to show by a preponderance of the evidence that they have satisfied the terms of the injunctive judgment.[1]

---

1. Rule 60(b)(5) allows relieving of a party from a final judgment "[if] the judgment has been satisfied . . . or it is no longer equitable that the judgment should have prospective application . . . ." Little discussion of the placement of the burden of proof has been found. Some opinions putting the burden on

the moving party are: *Daly v. Volpe*, 376 F.Supp. 987, 995 (U.S.D.C.W.D.Wash.1974); *Sunbeam Corp. v. Charles Appliances, Inc.*, 119 F.Supp. 492 (U.S.D.C.S.D.N.Y.1953); and *Blanchard v. St. Paul Fire and Marine Insurance Co.*, 341 F.2d 351, 356 (C.A. 5th Cir. 1965). The common law roots of the Rule appear to

## GEOLOGICAL INSTABILITY

### A. Pierre Shale

 In describing my concern with the original Final Environmental Statement, I said in the injunctive judgment that the FES failed to "describe the risk of possible danger from geologic instability at the damsite . . . and the need for scientific studies of that risk." In explaining the basis for the finding, I pointed in the memorandum accompanying the judgment to an uncertainty of the strength of the underlying rock and soil to support the dam. That uncertainty was prompted by evidence at the trial, not revealed in the FES, of instability a few miles downstream and of hydrostatic pressures at the dam from the reservoir. I said:

". . . All this intimates a risk of danger to the environment . . . and therefore needs to be explicated in the FES.

"I do not hold that the uncertainty must be eliminated before construction can go forward. I hold only that the uncertainty—its nature and basis and what is needed to remove it—must be expressed in the FES so that a decisionmaker may weigh it on the scales. . . ."

Memorandum of Decision of March 4, 1977, p. 9

The FESS, at B–1, states:

"Downstream from the dam, the river has eroded into the Pierre Shale. Three to 4 miles downstream . . ., the Pierre Shale crops out above river level. Certain units of the Pierre Shale have long been recognized as being unstable when they are unconfined, such as on a slope. One can see evidence of both recent and ancient sliding within the Pierre Shale.

\*　　\*　　\*　　\*　　\*　　\*

"Twenty-two core holes were drilled during the reconnaissance and feasibility investigations of Norden Damsite in 1956–57. The integrity of Norden Damsite and the suitability of the Pierre Shale as a foundation rock were affirmed during these earlier investigations. In order to confirm these earlier investigation results and later to provide the data needed for preparation of this supplement, further geologic investigations were undertaken in 1976. An additional 20 core holes were drilled. . . . Figure 2 shows all the drilling programs. Figure 3 shows all the drilling across the dam axis in cross section. Data obtained from field mapping, aerial photographs, and drilling indicates that: no landslide type movement has occurred within the Brule, Valentine, and Ash Hollow Formations at the damsite; the formations are sufficiently indurated to provide adequate bearing for the embankment; and these formations have low permeabilities which will result in minimal seepage losses through the abutments."

The FESS, at C–1, explains that the closest exposures of Pierre Shale to the damsite are three to four miles downstream. At the damsite, the Pierre Shale is about sixty feet below the ground surface and is completely confined. The FESS says:

---

justify this position. As to the writ of audita querela, for example, the burden was upon the movant to overcome the presumption of a judgment's regularity. 7 C.J.S. Audita Querela § 12, p. 1284; *Underwood v. Hart,* 23 Vt. 120 (1850). No policy reason is perceived by me for either shifting the burden from the defendants in this case or limiting the defendants' and intervenors' burden to that of going forward.

The defendants and intervenors cite cases putting the burden on the party attacking the adequacy of the environmental statement before any injunction has been issued or the injunction was refused because the statement was deemed adequate—such as *Sierra Club v. Callaway,* 499 F.2d 982 (C.A. 5th Cir. 1974);

*Sierra Club v. Morton,* 510 F.2d 813, 818 (C.A. 5th Cir. 1975); *Sierra Club v. Froehlke,* 534 F.2d 1289, 1300 (C.A. 8th Cir. 1976)—and cases where a preliminary injunction has been entered because no environmental statement was prepared before that but an environmental statement was prepared before the trial on the merits—such as *Boone v. Tillatoba Creek Drainage Dist.,* 379 F.Supp. 1239 (U.S.D.C.N.D. Miss.1974). None of these cases involved Rule 60 and none had the critical different fact of a final judgment. In the case now before the court the judgment of a permanent injunction has become final by the voluntary dismissal of the appeal begun by the defendants and intervenors (filing 116, August 2, 1977).

". . . The Pierre Shale at the Norden Damsite, because of its confinement, is not susceptible to landslide movement with or without construction of a dam. . . ."

## C–1

The comments by interested persons and groups are set out in full in the FESS. Some elaboration of the issue of risk of instability appears in these comments and the responses of the Bureau of Reclamation to them. Appendix A contains the geologic logs of drill holes made at the damsite, the undisturbed soil sampling data, the drill hole water level readings, maps of the surface geology of the site, reports of field investigations for bedrock and bed material below the damsite, borrow investigation maps, borrow aerial logs, and a summary of physical properties test results.

Summarized, the FESS says that the damsite is geologically stable and that signs of instability which may become evident during the design and construction phases can and will be overcome by careful design. Substantial reliance in the FESS is put upon the ability of the design team to recognize and avoid instability.[2]

The shortcomings of the FESS as to geologic instability are two: The risk attendant to the Pierre Shale at the damsite is not identified, and how the risk that does exist can be designed around is not described.

On the plaintiffs' side, the evidence is to the effect that the Pierre Shale at the damsite, although sixty feet below the surface may be in a rebounding position or a beginning diapir or a combination of squeeze deformation and rebound.[3] If any of these conditions exists, the Pierre Shale and the formations underlying it are a poor foundation for the dam, say the geologists who testified at the request of the plaintiffs.

In Comment 12 by Dr. Kenneth Emry, the possibility of the Pierre Shale's being in a rebounding posture is mentioned, and the response of the Bureau to that comment is to the effect that the rebounding, to the extent that it exists, will be stopped by the weight of the dam and that the dam will be designed "so that its load will not exceed the shearing strength of the rock." The response to Comment 34 also states that in

2. "Additional drilling will be required at the damsite prior to the final design of Norden Dam. Eight additional holes are scheduled to be cored at the damsite." B–38 and 39
". . . It is never assumed that a damsite is without problems; therefore, each dam is unique in that it is designed to fit the site and accommodate the problems as revealed by geologic investigations. Geologic investigations are conducted in stages to define and delineate the geologic conditions at the site. If unusual or difficult geologic conditions are present, investigations are continued until a design solution is reached. . . .
\* \* \* \* \* \*
"In accordance with policy and instructional procedures, the Bureau has appointed a project team to coordinate activities from the collection of specifications design data through the first filling of the reservoir. The design and construction progress will be continually reviewed by the Bureau specialists to assure geologic information, and basic layout of structures are consistent with sound design practices. The review includes site visits by team members to insure geologic conditions are recognized and reflected in the final dam design.
"Also in accordance with Reclamation policy an independent consultant review of the design of Norden Dam will be provided after completion of design and prior to construction." C–1, 3
A similar statement is in the response to Comment 3.

3. "Diapir is a dome or anticlinal fold, the overlying rocks of which have been ruptured by the squeezing out of the plastic core material.
. . . Diapirism is the process of piercing or rupturing of domed or uplifted overlying rocks by core material heated to the plastic state, either by tectonic stresses as in anticlinal folds, by or the effect of geostatic load in sedimentary strata as in salt domes or shale diapirs." Deposition of F. Walker Johnson, 58:23–59:8.
As the court understands it, a rebound is the response of a rock formation, such as Pierre Shale made pliable by exposure to water, to the removal of the overlying load of rocks and soil, such as by the downcutting action by the Niobrara River over the centuries, whereby the formation bulges upward at the point of least resistance in the middle of the channel. A squeezing deformation may be involved by the pressing downward by the abutments on pliable Pierre Shale, forcing the shale to bulge upward.

the Bureau's view, the Pierre Shale high is an erosional remnant[4], rather than rebound feature.

Although the Bureau's position that the rebound, if it exists, will be stopped by the weight of the dam and will be designed around has some appeal, the plain fact is that the FESS does not even acknowledge the presence of a risk of instability, much less describe the risk, as required by the injunctive order. Of course, if the evidence were decisive that there is no risk, I should rule that the condition of the injunction has been satisfied. The preponderance of the evidence is, however, that the risk is real but incapable of being assessed without further data. A decisionmaker needs more facts about the risk to be able sensibly to weigh it.

The risk, according to the evidence at the hearing, is more than a possibility of a rebound or an erosional remnant, which are the only conditions mentioned in the FESS. The upward bulge of the Pierre Shale in the river channel at the damsite may be an erosional remnant or a rebound. It may also be an incipient diapir or a combination of squeeze deformation and rebound. If it is an erosional remnant, it apparently is relatively stable because of its age—fifty to sixty million years old—but if it is a rebound or a diapir or a combination of squeeze deformation and rebound, its potential for instability is dramatically increased because of its recency—perhaps seven to seventeen thousand years—and the likelihood of its having caused fracturing and faulting in the overlying formations. Impressive expert testimony at the hearing supported the view that this kind of instability is a reasonable hypothesis from the data recovered by Bureau explorations and described in the FESS. A weakness of the FESS is that such a hypothesis is not addressed. It needs to be, based upon further scientific tests. If such tests yield no further reliable data, then at the very least there must be in a supplement to the FESS an acknowledgement that respected scientists disagree about the nature of the risk and a statement of their differing views and how the conditions, assuming the correctness of each view, can reasonably be dealt with. With less than that, a decisionmaker cannot responsibly decide whether to proceed with the project.

### B. Sand Channels

A second rejoinder by the plaintiffs to the defendants' claim that they have satisfied the first condition for the lifting of the injunction is that the FESS does not sufficiently reckon with the fact that there exist underground beds of permeable sands, left there in ages past by streams or rivers, which, if they extend into the damsite, may cause instability.

The testimony of the existence of these permeable channels in the vicinity of the reservoir was sturdy, and I find that the preponderance of the evidence supports their presence there. However, there is no persuasive evidence that they extend into the damsite or that, if they do, the design of the dam does not already assure freedom of risk from them.

The FESS at Comment 34 and the response talk of this subject. The comment says that a common cause of dam failure is piping, which is the rapid movement of water through underground channels, and the response is:

"Design considerations presently include a positive cuto[ff] extending into the Pierre shale plus a compacted soil blanket on certain parts of the upstream foundation materials. The combination of these two design concepts should preclude the possibility of failure by piping."

The preponderance of the evidence supports that statement. The statement and the comment are a sufficient assessment of the risks arising from underground sand channels.

### GROUNDWATER QUALITY

The judgment halting the dam construction cited the FES's failure to "predict

---

4. This means, evidently, that it is a high point left by eroding action of the elements when, millions of years ago, the Pierre Shale was the surficial layer.

on the basis of scientific studies an effect or lack of effect of the project on the ground-water quality in the region of the project." In the memorandum explaining the judgment, I noted:

> ". . . The conclusion [in the FES] that the impact [of the project] will be minimal was not based on scientific studies and, indeed, appears to have been based on a lack of them. The Bureau's responsibility was to discuss fully all significant environmental impacts, and it could not justifiably conclude that an impact would not be significant merely because the Bureau lacked information about the subject. Making studies would not have been of inordinate difficulty, so a duty devolved upon the Bureau to make them. . . ."
>
> Memorandum of Decision of March 4, 1977, pp. 11–12

Upon the basis of scientific studies, the FESS contains a prediction of an effect of the project on groundwater quality in the region of the project. It uses, principally, studies by the Bureau of Reclamation itself; *1976 Baseline Survey of the Groundwater Chemistry in Holt County, Nebraska* (1977), by M. E. Exner and R. F. Spalding; data collected in the 1970s by the United States Geological Survey; "Are We 'Killing' Our Soils with Herbicides?", by Steve Boeckman, in *Nebraska Farmer,* April 16, 1977; and materials written or gathered by B. T. Croll in 1974, the Corps of Engineers in 1977, and Earl Finder in 1973. The FESS summarizes findings shown in a series of charts and tables, as follows:

> "As discussed in Chapter C there will be an increase in TDS, other major constituents, and nitrates in both the Atkinson-O'Neill and Springview areas with the project.
>
> "With the O'Neill Unit in operation and no additional irrigation well development from the 1974 level, the TDS of the ground water will increase from 200 to 288 mg/1 in the Atkinson-O'Neill area and from 161 to 328 mg/1 in the Springview area.

> "With the O'Neill Unit in operation and substantially full development of the irrigable acreage in the study area, the TDS of the ground water will increase from 200 to 379 mg/1 in the Atkinson-O'Neill area and from 161 to 328 in the Springview area.
>
> "The major constituents that comprise TDS will have similar increases. The actual increases for each constituent of each study area and each development level are tabulated in Tables 14, 16, and 18.
>
> "These levels of concentration of TDS and its major constituents will have no adverse impacts on the anticipated uses of the ground-water resource in either service area.
>
> "Concentration of nitrate nitrogen will increase in both study areas for both development levels with the O'Neill Unit in operation and 20 percent of the applied nitrogen fertilizer leaching to the ground water. The Public Drinking Water Standard of 10 mg/1 is already exceeded in the Atkinson-O'Neill area. If no additional irrigation well development occurred and fertilizer management was perfect so that there was no contribution of nitrates to the ground water from fertilizer, the nitrate nitrogen levels would decrease from 11 to 4 mg/1 in the Atkinson-O'Neill area and increase from 2.4 to 2.6 mg/1 in the Springview area. If 20 percent of the applied fertilizer was leached to the ground water, the nitrate nitrogen concentration would increase from 11 to 18 mg/1 in the Atkinson-O'Neill area and from 2.4 to 15 mg/1 in the Springview area.
>
> "With the O'Neill Unit in operation and substantially full development of the irrigable acreage and no contribution of nitrates from fertilizer the nitrate nitrogen levels would decrease from 11 to 5 mg/1 in the Atkinson-O'Neill area. If 20 percent of the applied fertilizer was leached to the ground water, the nitrate nitrogen concentration would increase from 11 to 31 mg/1 in the Atkinson-O'Neill area. Substantially full development in the Springview area was as-

sumed to be the same as present level of development.

"Nitrate nitrogen concentrations will exceed Public Drinking Water Standards of 10 mg/1 for both present and substantially full development levels with the project. Nitrate nitrogen levels will exceed the drinking water standards by a considerably larger amount without the project if present levels of development would continue to be irrigated. This unavoidable adverse effect would be lessened by best management practices. The high concentrations of nitrate nitrogen are toxic primarily to infants and very young animals and not for the other anticipated uses. There are processes and equipment available for removing nitrates from water (Finder, 1973). Individuals living in the area, particularly near heavy well irrigation development and removed from any dilution effect of project water, may want to consider small individual nitrate removal equipment for their domestic supplies."

#### E–1, 2

I find that summary to be reasonably accurate, according to the greater weight of the evidence, and is a correction of the inadequacy relating to water quality found in the earlier FES.

The plaintiffs' attack on the prediction has three prongs: The prediction identifies no time reference; the testimony in support of the prediction was inconsistent; and the FESS does not sufficiently discuss additional salt that will be distributed in the ground through increased cattle feeding. None of these prongs invalidates the studies or the prediction.

It is true that the Bureau's studies were a steady-state portrayal, which assumed equilibrium conditions. The date of reaching equilibrium conditions may be over 200 years away, if the project is completed, and over 2,000 years away if it is not, but those facts do not alter the basic conclusion that the amount of nitrate and TDS concentration eventually will be less with the project than without it, but more than it is now

whether with or without the project. Moreover, calculating the relative concentrations of nitrate-nitrogen at given dates within the next 100 years or so—as imprecise and assumption-laden as the process is—would not change the stated conclusion. It would lessen the amount of difference between the with-project and the without-project figures, but that is all. The FESS does not present a glowing picture regarding pollution. For example, Dr. R. F. Spalding is quoted in the response to Comment 4, page 3, to the effect that:

"The net effect of the project in terms of ground-water quality is at present a matter of conjecture. It will probably result in as much deterioration of water quality in new areas of development as improvement of water quality in areas of high nitrate concentrations.

". . . Overall, the nitrate situation in the O'Neill area is not a valid argument for or against the Norden Dam project."

There was inconsistency between the testimony of John Walton Keys, III and Roger G. Andrews as to the sufficiency of available evidence upon which to conduct a transient-state analysis, but not such as to affect seriously the credibility of either.

As to salt, the plaintiffs presented the testimony of Dean Lansing, president of Agricultural Consultants, Inc., which does general testing of agricultural feed and livestock feeding yards. He disagreed with the FESS's statement that "Actual pollution of the groundwater by feed lots should be negligible." Appendix B, p. 37. His experience indicated that salt fed to cattle does pollute the groundwater. Nonetheless, I do not find his testimony to be of sufficient strength to overturn the FESS's conclusion, based upon Dr. Lloyd N. Mielke's studies, to the effect that an active feed lot develops an impermeable layer that largely prevents pollution from nitrate-nitrogen. The studies do speak in terms of nitrate-nitrogen, rather than salts (TDS), but one of Dr. Mielke's papers points out that:

"The nitrate-nitrogen ($NO_3$–N) content is the most common single criterion used to

indicate water pollution. Since $NO_3$–N is very soluable and mobile in water, it is often assumed that where water goes, $NO_3$–N goes, also."

Defendants' Exhibit 124I, p. 1

His studies affirm the statement in the FESS at C–19 that:

"Livestock feeding operations, even of large magnitudes, should not pollute the ground water of the O'Neill Unit if geologic and soil conditions are taken into consideration when the lots are located, the lots are managed and stocked properly and the proper runoff controls installed. . . ."

He testified that the state of the art now is that forced feeding of salt to cattle is not recommended. Voluntary feeding will, he said, result in less salt being deposited by cattle.

All in all, I find that there was no convincing evidence that salt fed to cattle in the project area would probably pollute to a significant degree the groundwater.

### WILDLIFE

The injunction was issued in part because the FES "does not, but should, detail upon the basis of scientific studies the anticipated impact of the project on the wildlife in the area of the proposed reservoir." The FESS accomplishes what the FES failed to do. In Appendix C are the details; the summary is in the Supplement itself.

In the memorandum explaining the injunction, I said:

". . . [A] census of the various species of wildlife and data of the habitat in the affected area are needed and can be acquired fairly readily. A correlation of the pre-construction wildlife population with the present habitat needs to be made. An analysis of the present habitat and the proposed post-construction habitat should be made to compare their capacities to maintain the species and to determine the degree of likelihood that those species would find their way to the proposed habitat. By that technique, apparently, the effect of the project on the wildlife can be predicted with a fair amount of accuracy. . . ."

Memorandum of Decision of March 4, 1977, p. 23

Appendix C sets out the results of a vegetative field survey, made in May and June of 1977, in which six habitat types were identified. Results of a survey of birds and mammals, made in May, June and September, 1977, are also in Appendix C. A description of the types of habitats existing and to be lost by the construction of the project appears. The birds and mammals, by kinds and approximate numbers, that are in the pre-construction habitats are described. To a lesser extent an analysis is there of the present habitat and the proposed post-construction habitat to compare their capacities to maintain the birds and mammals and the likelihood of survival of the wildlife types after the construction of the project.

An abbreviated version of the summaries at E–2 and E–3 of the FESS appears at G–1, as follows:

"For all practical purposes, 5,875 acres of habitat comprising riparian, lowland forest, mixed forest, evergreen forest, cropland, and grassland will be lost as wildlife habitat because of inundation by the reservoir. In addition, approximately 500 surface acres of stream environment will be lost as a result of inundation.

"The reproductive potential for about 49,-000 small mammals and 7,400 nesting birds will be irretrievably lost as a result of the project."

The plaintiffs disagree with the techniques of scientific field studies used by the Bureau and dispute the Bureau's conclusions. Upon full consideration of them, I am of the view that the techniques were acceptable and the conclusions sufficiently sound for the purposes of this litigation. My injunctive order did not anticipate studies as exacting or conclusions as exactly verifiable as would be warranted in some other contexts. For purposes of giving a decisionmaker a fair description of the probable consequences of a project to wildlife, the FESS is adequate.

*ALTERNATIVE*

■ The last inadequacy of the original FES was, in the words of the court's judgment of March 4, 1977, that it:

". . . does not, but should, assess, as an alternative to the construction of the proposed dam, a program of researching techniques for improving livestock and crop production without diminishing groundwater levels by irrigation."

The alternative is further described in the March 4, 1977, Memorandum of Decision at page 24, as follows:

". . . It is the alternative of using the project funds, some $160 million, or a portion thereof, to develop methods of improving livestock and crop production. If that could be done sufficiently, it is possible that water usage for irrigation could be reduced enough to allow normal groundwater reservoirs to accommodate the crops without a dam across the Niobrara River. Admittedly, the FES does not touch that alternative, and no study by the defendants has been made to determine whether it is a viable alternative. While this alternative may or may not offer promise, it deserves discussion in the FES, because it conceivably could satisfy the primary purpose of the project with friendlier environmental consequences."

Chapter H of the FESS summarizes the information which is in Appendix D. The overall conclusion appears in the Bureau's response to Comment 21 to the effect that future research for improving livestock and crop production without reducing groundwater reserves "shows little or no promise." If that conclusion is reasonably supported by the material presented in the FESS, the research alternative has been adequately treated.

Two approaches are taken in the FESS toward analyzing the research alternative. First, the FESS states that approximately $1 billion in federal funds was spent in 1976 for agricultural research nationwide, that about $100 million has been spent on research over the past ten years at the Nebraska Agricultural Experiment Station, and that "[i]n addition to public funds that are spent by Government agencies, agricultural research carried on by private industry each year slightly exceeds the money expended annually by the USDA and all the State Experiment Stations for Agricultural Research combined . . ." (H–1) The purpose, evidently, of reciting these figures is that "[o]n a comparative basis, these combined expenditures bring into perspective the amount of funds being expended on agricultural research and the funds proposed to be spent on construction of the O'Neill Unit ($160 million)." (H–2) The shortcoming of the recitation of these figures is that they do not provide a perspective. That is so, because under either the project or the alternative under discussion, the entire $160 million [5] would be spent or available for being spent to increase the economic health of the region of the project—essentially a five-county area—rather than the health of the nation or of the state. That is not to say that no benefit to the nation or state is to be expected, but in order to compare the $160 million proposed to be spent on the project or the alternative to improve conditions in the five-county area with some other amount spent nationwide or statewide, that other amount should be of money spent to address conditions that are extant in the five-county area. The purpose of the two spendings should be the same, if comparison is to be made and inferences drawn. Nothing in the FESS, including Appendix B, provides these comparative figures. Therefore, the figures of nationwide and statewide spending given in the FESS do not yield an inference that spending only $160 million or so on research applicable to the five-county area offers "little or no promise" of making an impact on the five-county area's economy. Maybe it would and maybe it would not. Testimony at the recent hearing indicated that it probably would, by finding ways to cause farmers

5. Rising costs have driven the figure upward. It may now be about $192 million, according to the response to Comment 15 in the Alternatives section of the supplement.

and ranchers to make use of technology already developed and already known to be capable of being developed.

Second, the FESS makes a showing of agricultural statistics for the recent past in the five-county area. For example, the carrying capacities of the rangeland in the five-county area have remained about the same for the past twenty years, "although research of grazing methods, grass varieties and livestock has been continuing." (H–4) Similarly, the FESS says, ". . . the cow and calf numbers have not changed significantly over the past 20 years." (H–4) As for crops, the FESS says that dryland crop yields in the five-county area have shown "only moderate response to technology and applied research over the past 20 years," (H–7) and concludes that "due to the uncertainty and limited amounts of rainfall, the low water holding capacity of the soils, and the limited results of past research efforts, major production increases are not anticipated." (H–7) Irrigated crops have fared better, according to the FESS. It states that irrigated corn yields have increased from less than 60 to 112 bushels per acre and that yields of irrigated alfalfa have increased from about 2.6 to 4 tons per acre, and concludes that "[c]omparison of these statistics shows that irrigated crops have responded to applied research and technology to a much greater degree than dryland crops." (H–7)

Although the cited statistics support the conclusion that dryland output has not kept pace with irrigated output the last two decades, they afford little help in judging the merits of the research alternative. The FESS cites the statistics but draws no interpretative conclusions, except in the Bureau's response to Comment 21. There, the Bureau says that future research for improving livestock and crop production without diminishing groundwater reserves "shows little or no promise." Upon careful consideration, I conclude that the statistics on output for the past twenty years are no basis for that statement. This is particularly apparent when it is noted that the FESS contains nothing to show what utilization has been made in the five-county area of

technological advances made in the past decade or two. It is quite impossible to say that research in the future cannot be effective because research in the past has not been effective, unless one learns that the fruits of past research have been tried. No studies were made by the preparers of the FESS to learn the extent to which technological advancements have been tried in the five-county area, or, if they have not been tried, why they have not. Taking the position now, as the preparers of the FESS do, that such a study was not required by the court's order is not convincing. The fact is that the court did not require the defendants to *do* anything. It enjoined their proceeding with the project without, among other things, assessing a particular alternative. If they want the injunction lifted, it is their burden to show that they assessed that alternative, and they do not carry the burden by relying upon a conclusion not linked logically and factually to a premise.

The FESS also builds upon the declaration that:

"The consumptive use of an irrigated crop is estimated to be 27 inches of water at the plant according to studies by the Bureau of Reclamation . . . Naturally available water to the crops in the area during the growing season averages approximately 14 inches. The remaining 13 inches of water required by the plant must be supplied by irrigation.

". . . [T]he probable ultimate level of irrigation development in the study area, assuming the continued use of center pivots, is about 184,000 acres. If 184,000 acres of land could be irrigated from wells, approximately 6 inches of water per acre would be available from natural sources on a sustained basis. If the crop irrigation requirement could be reduced from 13 inches to 6 inches of water (consumptive use of 20 inches or less) through researching techniques . . ., then increased crop and livestock production may be accomplished without the ultimate depletion of the ground-water aquifer. . . . Nearly all of the significant increases in crop yields have been at

872

the expense of higher consumptive use of water. Limiting the availability of water only tends to limit increased production in an area with insufficient precipitation for full production."

### H–7, H–9

The problem begins with the generality of the basic figure of twenty-seven inches of water. It is not shown to be related to any specific crop or even to any group of crops capable of being grown in the five-county area, but is, evidently, an average for all crops, wherever grown. Whether one or more specific crops by the use of modern and future techniques can be grown in the five-county area with twenty inches of water is not treated in the FESS.

For example, Appendix D points out that "sorghum is considered to be a more dependable crop [than corn] where soil moisture is limited because it has a low consumptive water use." (p. 20) How much lower? The FESS does not tell us. Can it now or with some future research be grown where there is twenty inches of water available annually? We do not know from the FESS. Sunflowers are discussed in the same vein. Nothing, however, compares its water needs or potential water needs with the availability of water in the five-county area. Hybrid wheat and soy beans are mentioned in the FESS as water conserving crops (Appendix D, p. 44), but no analysis of their potential in light of available water in the O'Neill Unit area is offered.

Can the practice of mulch tillage, irrigation scheduling, use of an imprinter, or employment of other techniques conserve enough water to span the difference between the amount of moisture needed by a particular crop that is commercially feasible in the five-county area and the fourteen

inches that fall from the clouds plus perhaps six inches obtainable from groundwater without further depleting water tables? No answer is suggested in the FESS on the basis of any scientific evidence.

Testimony at the trial shows that research already has been done by agricultural scientists on the water needs of specific crops. The results of the research were available to the Bureau of Reclamation for inclusion in the FESS. Lack of it in the FESS leaves the document insufficient.

Range management technology also has relevancy to the issue. The FESS notes that many techniques are used in Nebraska to increase beef production, including brush management, planned grazing systems, range reseeding, and others (Appendix D, p. 28). Also noted is the fact that research is ongoing concerning beef cattle nutrition, use of irrigated pasture, and fighting of weeds, disease and insect pests (Appendix D, p. 29). There is no assessment, however, of any of these features in terms of the five-county area's needs. Whether these and similar efforts have had any impact on rangeland and ultimately on livestock production elsewhere about the country, whether they are being used in the five-county area, and what the economic effect is likely to be if they are utilized more in the future than in the past in the five-county area, are not addressed in the FESS. Until they are, a decisionmaker can do no more than speculate about the efficacy of a research alternative.

Perhaps I have said enough to illustrate the nature of the shortcomings of the FESS's treatment of the research alternative issue. I have not been exhaustive, but have pointed the way as to what is needed. The procedure should be approximately as follows: [6]

6. I use this unusual degree of specificity, because there was testimony at the hearing to the effect that the defendants had difficulty in interpreting the injunctive order and the memorandum, insofar as the alternative issue was concerned. Reference was made to the fact that, following the entry of the injunction, a request for clarification had been made but no clarification ensued.

It is true that a motion for amplification and amendment to the court's findings and judgment was filed (filing 109). Briefs were submitted and oral argument held. The memorandum that followed did not treat the research alternative, except to say that the request regarding it had been considered and rejected.

What the record shows is that the motion asked the court:

I. Through a professional review of the scientific literature, determine the presently available agricultural technology for improving livestock and crop production with and without irrigation;

II. Learn the extent of the present use in the five-county area of available agricultural technology and the results of that use in terms of livestock and crop production and groundwater consumption;

III. Determine the probable results in terms of livestock and crop production and groundwater consumption from a realistic amount of use in the five-county area of the technology which has already been developed and which reasonably may be developed within the foreseeable future by expenditure of sums that would be at hand upon adoption of the research alternative in place of the project;

IV. Compare II to III; and

V. Compare III to the probable impact of the project without the research alternative.

That process need not be exhaustive, but it does need to deal fairly with each subject of the process—beef cattle, dairy cattle, swine, feed crops, and grasslands. The present FESS performs I partially; it does not II, III, IV or V.

1. "To provide amplification of the Court's order . . ."
The brief in support of the motion expressed concern about steps and timing for distribution of a supplement; that was stressed in oral argument and dealt with in detail in the memorandum and order of April 13, 1977, which amplified and amended the judgment.
2. "To amend the Court's finding [as to what the primary purpose of the project is.]"
That request was not to clarify what to do with the research alternative, but to find that the primary purpose of the project was to irrigate, rather than to stimulate the economy of the area. I retained the finding that economic stimulus of the area was the primary purpose of the project.
3. "To amend, amplify, and alter the Court's . . . judgment that the FES must consider [a research alternative.]"

The test remains the same as previously: Have the defendants, in the words of the applicable guidelines of the Council on Environmental Quality, appearing in the Federal Register of April 23, 1971, made a "rigorous exploration and objective evaluation of alternative actions . . .?" I cannot say that they have.

The brief submitted in support of the defendants' motion for amplification and amendment did not suggest that the research alternative was not understood. It, rather, argued that the research alternative (a) did not reasonably relate to the purpose of the project (to irrigate), (b) was beyond the control of the Bureau, and (c) was not a reasonable alternative. None of these arguments seemed to me then or seem to me now to ask for a clarification of how to go about assessing an alternative to the project of researching techniques for increasing production without depleting groundwater reserves. Nonetheless, it is apparent now that the defendants did not perceive fully the task, so detailed guidelines are set out.