CITIZENS TO PRESERVE WILDERNESS PARK, INC., et al., Plaintiffs,

v.

Brockman ADAMS, et al., Defendants.

No. CV79–L–137.

United States District Court, D. Nebraska.

Sept. 22, 1981.

Karen B. Flowers, Lincoln, Neb., for plaintiffs.

David Kubichek, Asst. U. S. Atty., Omaha, Neb., Gary R. Welch, Asst. Atty. Gen., Lincoln, Neb., Donald C. Vosburgh, Gen. Counsel, Federal Highway Administration, Kansas City, Mo., for defendants.

## MEMORANDUM OF DECISION

URBOM, Chief Judge.

A West Bypass, an expressway facility around a part of Lincoln, Nebraska, if constructed as proposed, would take a part of Wilderness Park. The legal issues are whether the federal laws touching that kind of taking have been met.

Suit has been brought under the Department of Transportation Act of October 15, 1966, 49 U.S.C. §§ 1651 et seq.; the Federal-Aid Highway Act of 1968, 23 U.S.C. §§ 101 et seq.; 28 U.S.C. § 1331(a); 5 U.S.C. §§ 701 et seq.; the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.; and the Civil Rights Act, 42 U.S.C. §§ 1981 et seq. The parties agree and I find that the court has jurisdiction and the plaintiffs have standing.

### I.

### UNCONTROVERTED FACTS

Additional facts will be set out throughout other sections of this memorandum of decision, but the facts stipulated in the order on pretrial conference, filing 24, appear in this section.

The proposed West Bypass is an expressway facility which serves to connect U. S. Highway 77 south of Lincoln, Nebraska, with Interstate 80 northwest of Lincoln. The bypass begins south of Old Cheney Road where Highway 77 curves to the northeast and ends at Interstate 80 southwest of Salt Creek. As proposed, the West Bypass is designated a major federal aid project; construction of it constitutes major federal action; construction of it requires compliance with the National Environmental Policy Act, including the preparation of an Environmental Impact Statement pursuant to 42 U.S.C. § 4332; and construction of the West Bypass as proposed by the Nebraska Department of Roads would involve taking of land from Wilderness Park.

Wilderness Park is a park of state and local significance, as contemplated by 49 U.S.C. § 1653(f) and 23 U.S.C. § 138. Construction of the West Bypass as proposed by the Nebraska Department of Roads requires the completion of a "4(f) Statement" for submission to the Secretary of the Department of Transportation upon which the Secretary can carry out the requirements imposed upon him by 49 U.S.C. § 1653(f) and 23 U.S.C. § 138.

A combination EIS/4(f) Statement was prepared by the Nebraska Department of Roads to meet the requirements of the National Environmental Policy Act, the Federal-Aid Highway Act, and the Department of Transportation Act. The final combina-

tion EIS/4(f) Statement was submitted to the department of Transportation in early 1974.

In March, 1975, the Nebraska Department of Roads submitted an Addendum to the combination EIS/4(f) Statement; the Addendum was submitted to the Secretary of the Department of Transportation for purposes of the 4(f) determination.

The Secretary of the Department of Transportation approved the West Bypass project as proposed and specifically found that there were no prudent and feasible alternatives to taking of land from Wilderness Park. The following alternative routes for the West Bypass were the subject of formalized feasible and prudent decision-making by the Secretary, as envisioned by a 4(f) Statement:

  a. The proposed route;
  b. The "West-Line" documented and identified in the March, 1975, Addendum to the EIS/4(f), denoted "comparison of East and West Alignments, U. S. 77 Lincoln West Bypass."

The "West-Line" described in b above was determined by the Secretary not to be a prudent and feasible alternative to the proposed route, for these reasons:

  1. The State Regional Center objected to the use of the Center land, because of its concern for safety and noise impacts on its patients;
  2. Costs estimates appeared excessive;
  3. The additional travel distance decreased the service of the traveling public;
  4. Certain difficult design problems were encountered with an interchange and railroad crossing;
  5. Some of the aesthetic amenities of Pioneers Park would have been damaged;
  6. There would be noise and visual impact on the State Regional Center; and
  7. The Yankee Hill School District would have been severely impacted.

The defendants David Coolidge, Brockman Adams, and the present Secretary of the Department of Transportation are not liable in their individual capacities.

## II.

## ALTERNATIVES

A. *National Environmental Policy Act (NEPA)*

To promote the policy of using "all practicable means and measures . . . in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans,"[1] the Congress of the United States requires that "to the fullest extent possible" all agencies of the federal government shall:

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

\* \* \* \* \* \*

(iii) alternatives to the proposed action . . ."[2]

The purposes of the detailed environmental impact statement are at least these:

"1. To ensure that agency officials will be acquainted with the trade-offs which will have to be made if any particular line of action is chosen;

"2. To explicate fully the agency's course of inquiry, analysis, and reasoning, thus opening up the agency's decision-making process to critical evaluation by those outside the agency, including the public;

"3. To supply a convenient record for courts to use in reviewing agency decisions on the merits; and

---

1. 42 U.S.C. § 4331.

2. 42 U.S.C. § 4332(2)(C).

"4. To provide full disclosure to the public of environmental issues.

"*Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346 (C.A. 8th Cir. 1972); *Minnesota Public Interest Research Group v. Butz*, 541 F.2d 1292 (C.A. 8th Cir. 1976). It is the essence of the NEPA that the detailed statement 'gather in one place' a discussion of the relative environmental impacts of alternatives. *Environmental Defense Fund, Inc. v. Froehlke*, supra, at 350."

*Save the Niobrara River Association, Inc. v. Andrus*, 483 F.Supp. 844, 849 (D.C.Neb.1979)

Tit. 42 U.S.C. § 4332(2)(E) declares that each agency shall "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternate uses of available resources."

The statement in *Save the Niobrara River Association v. Andrus*, supra, at 850, contains an elaboration of the legal standard:

"An [EIS] is to be judged by a legal standard which seeks to be a guide to interpreting the NEPA requirement that the statement be 'detailed.' *Sierra Club v. Froehlke*, 534 F.2d 1289–1299–1300 (C.A. 8th Cir. 1976), puts it this way:
' " ... The discussion of environmental effects need not be 'exhaustive' but rather need only provide sufficient information for a 'reasoned choice of alternatives.' *Natural Resources Defense Council, Inc. v. Morton*, 148 U.S. App.D.C. 5, 458 F.2d 827, 836 (1972). ... Section 102(2) does not require that 'each problem be documented from every angle to explore its every potential for good or ill.' "
' ... The courts must employ a rule of reason in the examination for adequacy of these statements, lest the litigation have no end. . . .
' " ... The effectiveness of Section 102(2) [42 U.S.C. § 4332(2)] depends upon compliance with procedural duties 'to the fullest extent possible,' *i.e.*, a compliance, the completeness of which is only limited by the agency's statutory obligations. While no agency may properly adopt a less demanding standard for their effort, judicial review is based on a pragmatic standard. In determining whether an agency has complied with Section 102(2), we are governed by the *rule of reason* ..."
'*Sierra Club v. Morton*, 510 F.2d 813, 818–819 (5th Cir. 1975).' "

█ Whether conclusionary statements without supporting details are sufficient depends upon the circumstances. Where the need for the project is strong, possible alternatives are extremely limited, and the choices "would not greatly differ" (the alternative road routes were "essentially the same tillable farm land"), detail can be less than otherwise. *Iowa Citizens for Environmental Quality, Inc. v. Volpe*, 487 F.2d 849 (C.A. 8th Cir. 1973). Cf. *Natural Resources Defense Council v. Grant*, 355 F.Supp. 280 (U.S.D.C. E.D.N.Car.1973).

## B. *Section 4(f) Provisions*

Parkland is awarded special consideration by two pieces of legislation adopted by Congress. Both the Federal-Aid Highway Act, 23 U.S.C. § 138, and the Department of Transportation Act, 49 U.S.C. § 1653(f), declare an identical policy, known as the 4(f) Provisions:

"It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands ... [T]he Secretary [of Transportation] shall not approve any program or project which requires the use of any publicly owned land from a public park ... of ... State or local significance ... unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park ... resulting from such use. . . ."

This policy wording was adopted by the Congress in 1968. The legislative history is of some, but not much, help in deciding

whether there is a "feasible and prudent alternative to the use of such land." The language of the policy was a compromise of wording in the House of Representatives bill and the Senate bill.

House Report No. 1584, 90th Congress, Second Session, U.S.Code Cong. & Admin. News 1968, p. 3482, contains these words: ". . . Parklands . . . have very real value . . . No rational person would suggest, however, that that value is the only one to be considered in a judgment as to the best public interest. In weighing alternatives for highway location, equal consideration must be given to other factors— to whether people will be displaced; to whether existing communities will be disrupted; to whether the established demand for adequate transportation facilities for people, goods, and services will be met; and to the preferences of the people of the area involved . . ."

Senate Report No. 1340, 90th Congress, Second Session,[3] states:

"The committee is firmly committed to the protection of vital park lands, parks . . . and the like. We would emphasize that everything possible should be done to insure their being kept free of damage or destruction by reason of highway construction. . . .

"The committee would further emphasize that . . . there are other high priority items which must also be weighed in the balance. The committee is extremely concerned that the highway program be carried out in such a manner as to reduce in all instances the harsh impact on people which results from the dislocation and displacement by reason of highway construction. Therefore, the use of park lands properly protected and with damage minimized by the most sophisticated construction techniques is to be preferred to the movement of large numbers of people."

The Conference Report No. 1799, 90th Congress, Second Session,[4] says:

"This amendment of both relevant sections of law [23 U.S.C. § 138 and the Department of Transportation Act] is intended to make it unmistakably clear that *neither* section constitutes a mandatory prohibition against the use of the enumerated lands, but rather, is a discretionary authority which must be used with both wisdom and reason. The Congress does not believe, for example, that substantial numbers of people should be required to move in order to preserve these lands, or that clearly enunciated local preferences should be overruled on the basis of this authority."

In confronting the foregoing policy statement and the legislative history leading to it, the Supreme Court of the United States in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), said that the legislative history "is ambiguous" and "[b]ecause of this ambiguity it is clear that we must look primarily to the statutes themselves to find the legislative intent." 401 U.S. at 412, n. 29, 91 S.Ct. at 821, n. 29. The court described the standard to be applied by the Secretary as follows:

"Despite the clarity of the statutory language, respondents argue that the Secretary has wide discretion. They recognize that the requirement that there be no 'feasible' alternative route admits of little administrative discretion. For this exemption to apply the Secretary must find that as a matter of sound engineering it would not be feasible to build the highway along any other route. Respondents argue, however, that the requirement that there be no other 'prudent' route requires the Secretary to engage in a wide-ranging balancing of competing interests. They contend that the Secretary should weigh the detriment resulting from the destruction of parkland against the cost of other routes, safety considerations, and other factors, and determine on the basis of the importance that he at-

---

**3.** 3 U.S.Code Cong. & Admin.News, 3482, 3500 (1968).

**4.** 3 U.S.Code Cong. & Admin.News, 3531, 3538 (1968).

taches to these other factors whether, on balance, alternative feasible routes would be 'prudent.'

"But no such wide-ranging endeavor was intended. It is obvious that in most cases considerations of cost, directness of route, and community disruption will indicate that parkland should be used for highway construction whenever possible. Although it may be necessary to transfer funds from one jurisdiction to another, there will always be a smaller outlay required from the public purse when parkland is used since the public already owns the land and there will be no need to pay for right-of-way. And since people do not live or work in parks, if a highway is built on parkland no one will have to leave his home or give up his business. Such factors are common to substantially all highway construction. Thus, if Congress intended these factors to be on an equal footing with preservation of parkland there would have been no need for the statutes.

"Congress clearly did not intend that cost and disruption of the community were to be ignored by the Secretary. But the very existence of the statutes indicates that protection of parkland was to be given paramount importance. The few green havens that are public parks were not to be lost unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes. If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems." 401 U.S. at 411–413, 91 S.Ct. at 821–822.

■ It appears, then, that the approach to the first portion of the 4(f) Provisions— those in 4(f)(1)—must be to give great weight to the protection of parklands, to find a particular alternative to the use of parkland "feasible" unless it would not be so as a matter of sound engineering, and to

find a particular alternative to the use of parkland "prudent" unless there are truly unusual factors present or the cost or community disruption would reach extraordinary magnitude. The primary focus of inquiry needs to be upon the harshness of the problems inherent in the alternative, not upon the comparative freedom from those problems by use of the parklands. Nonetheless, the Secretary need not ignore the nature of the parklands or the effects of the use of them. He must give parklands great deference but need not treat all parklands exactly alike.

This approach allows consideration of all factors, but does not put them on "equal footing;" it requires the presence of "truly unusual factors" or disruption of "extraordinary magnitude" that are "unique problems" before parkland can be taken, yet leaves assurance that "substantial numbers of people should [not] be required to move in order to preserve these lands, or . . . clearly enunciated local preferences should [not] be overruled . . ." It allows consideration of "cost and disruption of the community" while insisting upon giving protection to parkland "paramount importance." It avoids a "wide-ranging balancing of competing interests" and does not permit the Secretary's determination to be the "importance he attaches to those other factors."

I do not accept the argument of the defendant Coolidge that this case is one of "parks versus people" and that people ought to win. To be sure, houses are important to people. So are mental hospitals, and schools, and roads. But so are parks, and Congress has given voice to that fact. The court's role is to hear what it means.

The plaintiffs argue that the Secretary was prohibited from taking into account in any way the nature, quality, or effect of the taking of parklands in his 4(f)(1) decision. Their position is that the issue of an alternative's being feasible and prudent is to be isolated from an assessment of the parkland use. If that were so, the taking of seventeen houses or thirty houses or the severing

of a school district or the impinging on a mental hospital or any other factor or collection of factors would have a fixed weight, the same whether the highway would cut a park in two or brush its edge, or swallow up the heartland of Central Park in New York or Brackenridge Park in San Antonio[5] or Overton Park in Memphis or a corner of Wilderness Park in Lincoln.

It is true that *any* parkland in *any* amount triggers 4(f)(1) but once 4(f)(1) is triggered, neither the Act of Congress, nor the legislative history, nor the Supreme Court of the United States in *Overton Park*, supra, says that in deciding whether an alternate route is prudent it matters not a whit whether the alternate is an alternate to the taking of a square inch or a square mile. Neither does any say that all parkland must be pretended to have the same quality. In the greater scheme of things it cannot be so, not in exercising "discretionary" authority with "wisdom and reason."[6] To the extent that the Fifth Circuit Court of Appeals in *Louisiana Environmental Society, Inc. v. Coleman*, 537 F.2d 79 (1976), indicates something different, I respectfully disagree with it.[7]

Of course, the second portion of the 4(f) inquiry—determining whether the proposed route "includes all possible planning to minimize harm to such parks"—requires a further refinement, so as to reduce as much as possible the harm to the parkland. That is separate from the 4(f)(1) feasible-and-prudent inquiry.

■ One other principle needs stating: An alternate route which uses any part of a park is not an alternative to use of the park[8] and therefore is to be judged by 4(f)(2), not 4(f)(1).

## III.

### STANDARD OF REVIEW

■ Section 706 of the Administrative Procedure Act, 5 U.S.C. § 706, sets the standard of review by this court of the action of the Secretary of Transportation. The court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law." The Secretary's decision is entitled to a presumption of regularity. The presumption is "not to shield his action from a thorough, probing, in-depth review" but "[t]he ultimate standard of review is a narrow one" and "[t]he court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, supra.

■ The burden of proof rests upon the plaintiffs.

## IV.

### WHETHER THE SECRETARY ACTED WITHIN THE SCOPE OF HIS AUTHORITY

Under the *Overton Park* decision, this court must decide whether the Secretary properly construed his authority as being limited to approving the use of parkland for a highway only when there is no feasible and prudent alternative.

■ Formal findings which articulated the basis for the Secretary's approval of the chosen route, taking a part of Wilderness Park, were prepared by the Secretary. They were never offered into evidence—not

---

5. The reference is a park discussed in the debates on approval of the Conference Report No. 1799, cited in footnote 4.

6. Conference Report No. 1799, supra.

7. I am not persuaded that the Fifth Circuit would agree with the plaintiffs' position here. It characterized its standard as a "thumb-on-the-scale approach." That is an appropriate

term to reflect a balancing process, skewed as it may be, but hardly to reflect an abolition of the scale.

8. *Finish Allatoona's Interstate Right, Inc. v. Brinegar*, 484 F.2d 638 (C.A. 5th Cir. 1973); *Citizens to Preserve Foster Park v. Volpe*, 466 F.2d 991 (C.A. 7th Cir. 1972).

by inadvertence. In the absence of them there is insufficient evidence from which I could say that a presumption of regularity of the proceedings has been overcome. Furthermore, he made a finding, according to the uncontroverted facts, that there were no prudent and feasible alternatives to taking of land from Wilderness Park. That reflects an awareness, at least, of that standard.

## V.

## WHETHER THE SECRETARY CONSIDERED ALL REASONABLE ALTERNATIVES TO THE ROUTE THROUGH THE PARK

*Brooks v. Coleman,* 518 F.2d 17 (C.A. 9th Cir. 1975), is authority for a holding that failure of the Secretary to consider all reasonable alternatives to the use of parkland is ground for overturning the Secretary's approval of using parkland as arbitrary and capricious. Were there reasonable alternatives to the use of Wilderness Park that were described in the administrative record but not considered by him or that were not described in the administrative record and therefore not presented for his consideration?

■ As to the first half of the question, I cannot know the answer from the evidence, because the only clear evidence of what the Secretary actually did or did not consider may well be in the formal findings of the Secretary, and they are not in evidence. It is true that the defendant Adams, as Secretary, in his answer to an interrogatory[9] asking him to identify each route which "was considered by you as an alternative to the taking of parkland," answered:

"Route through Regional Center property, documented and identified in March 1975 addendum to Environmental Impact Statement (EIS) denoted Comparison of East and West Alignments, U.S. 77 Lincoln West Bypass. A previous route west of the Regional Center had been considered in a corridor study denoted U.S. 77 Lincoln-South Freeway dated 1971 prepared by consultants Van Doren-Hazard-Stallings-Schnacke, Engineer-Architects, Topeka, Kansas."

The plaintiffs argue that that statement means that the Secretary did not consider two reasonable alternatives to use of parkland: Southwest Sixth Street and East of Salt Creek. But neither of those alternatives is an alternative to the use of parkland—both would use parkland. The Southwest Sixth Street alternative actually has two forms—one that would take a strip along the west edge of Wilderness Park, and another that entails moving the route immediately outside (west) of the west edge of Wilderness Park, but the air and noise pollution would still affect, and thus there would be a use of, Wilderness Park.[10] The East of Salt Creek route would impinge directly upon Sawyer Snell Park and Van Dorn Park, both publicly owned parkland.

Once having decided that there were no feasible and prudent alternatives to the use of parkland, as the Secretary did, he was obliged by 4(f)(2) to study other routes that also used parkland to determine whether they would minimize harm to parklands. Information about the Southwest Sixth Street and East of Salt Creek routes was in the administrative record. Nothing in the evidence—including the answer to the foregoing interrogatory, which pinpointed 4(f)(1) matters only—shows that the Secretary did not consider that information in a 4(f)(2) analysis. The burden on the plaintiffs has not been carried.

Directly considering the second half of the question appearing at the beginning of this section, I conclude that the possibly reasonable alternatives to the approved route were described in the administrative record.

---

9. Interrogatory 2, plaintiffs' Exhibit 9.

10. *Brooks v. Volpe,* 460 F.2d 1193 (C.A. 9th Cir.

## VI.

## WHETHER THE ADMINISTRATIVE RECORD WAS ADEQUATE FOR 4(f) AND NEPA PURPOSES [11]

The *Overton Park* opinion foresees a judicial decision on the question of whether the Secretary could have reasonably concluded that there was no feasible and prudent alternative "based on the facts before him." If he could not have so reasonably concluded, his decision to use parkland was arbitrary, capricious and an abuse of discretion. Two constituents make up the conclusion: Was the administrative record sufficient to allow him reasonably to make a 4(f)(1) determination? Would a decision, based upon the record, of no feasible and prudent alternative necessarily be arbitrary, capricious and an abuse of discretion or otherwise contrary to law?

### A. Sufficiency of the Administrative Record

The administrative record consists of the EIS/4(f) Statement [12] and the 1975 Addendum.[13] I stand firm on my expression in *Save the Niobrara River Association v. Andrus*, 483 F.Supp. 844, 849–850 (U.S.D.C. Neb.1979), as to what physically makes up an environmental impact statement (EIS):

"... Perhaps the most meaningful test is what a lay person, an interested member of the general public, needs and reasonably can expect to have in making an informed evaluation of the environmental risks. Scattered documents, not even specifically cited in a single document for support of a particular environmental fact, do not meet that test. If a conclusion is stated in the [EIS] and the reader is then directed to another document for data supporting the conclusion, the docu-

ment to that extent should be considered to be a part of the [EIS], if it is accessible to all, including the public."

■ The Corridor Study [14] is referenced only generally in the EIS/4(f) Statement, is not "specifically cited ... for support of a particular environmental fact" and thus does not meet the test of "what a lay person, an interested member of the general public, needs and reasonably can expect to have in making an informed evaluation of the environmental risks."

The 1975 Addendum is included, because it is a supplement to the EIS/4(f) Statement, elaborating on an alternative route discussed in the EIS/4(f) Statement. That 1975 Addendum was not circulated in the manner the EIS/4(f) Statement was or as the 1975 Addendum would need to be to accord with *1980* regulations,[15] but that does not disqualify it. The President's Council on Environmental Quality's Third Annual Report to Congress (1972), said at pp. 238–239:

"One argument holds that when a commenting group or reviewing court has pinpointed a defect in a statement, it should be corrected in a new draft and the new draft circulated for additional comments. One Federal district court, in a case involving the Interior Department's proposed offshore Louisiana oil and gas leases, appears to have adopted this view. However, to impose a flat requirement of recirculation, even when the project itself is not changed, could cause unnecessary repetition and delays, often with little gain in fulfilling the purposes of section 102(2)(C). Indeed, it might create an incentive for an agency not to improve its statement after circulating the draft. A commenting group or reviewing court may contribute valuable

1972).

**11.** Although the plaintiffs claim a failure to comply with § 102(2)(E) of NEPA, which requires study and development of alternatives, an analysis of the administrative record is sufficient in this case. If it is adequate, it reflects an adequate study. If the record is not sufficient, it does not matter whether the study was

adequate. See *Overton Park*, supra 401 U.S. at 416, 91 S.Ct. at 823.

**12.** Plaintiffs' Exhibit 1.

**13.** Plaintiffs' Exhibit 2.

**14.** Defendants' Exhibit 5.

**15.** 23 C.F.R. 771.12(*o*).

factual or legal insights which can then be incorporated into the statement. If the defect is fully corrected in the revised statement, then the 102 process has accomplished its primary goal: a thorough environmental analysis incorporated in a document for the decisionmaker that is made public at least 30 days before any proposed action. Other agencies and groups have been apprised and have contributed to the analysis. Recirculation should be considered only when the second statement discusses significant new issues. Judgments on the need for recirculation are best made on a case-by-case basis. But at some point the process of circulation and comment must end."

See, also, *Environmental Defense Fund, Inc. v. Froehlke*, 368 F.Supp. 231 (U.S.D.C. W.D.Mo.1973), affirmed sub nom. *Environmental Defense Fund, Inc. v. Callaway*, 497 F.2d 1340 (C.A. 8th Cir. 1974).

As to the plaintiffs' claim that no 4(f) Statement was circulated, no authority has been cited and I know of none requiring its circulation.

■ For both NEPA and 4(f) substantive purposes the standard appears to be the same. The administrative record must discuss reasonable alternatives to the proposed route with sufficient objective data to enable the decisionmaker to assess the alternatives and to make a reasoned choice from among them.

The alternatives deserving discussion in the EIS/4(f) Statement are three: The West-Line, Southwest Sixth Street, and East of Salt Creek.

*(1) West-Line*

This alternative route is a subject of the EIS/4(f) Statement itself and is covered at length in the 1975 Addendum. The issue is whether the discussion is adequate.

Although the plaintiffs argue that the 1975 Addendum is not a part of the administrative record for lack of circulation, I have declined to accept the argument.

The Addendum describes the West-Line in detail. It would branch off Highway 77 at about Old Cheney Road, moving northwest across Folsom Street and Pioneers Boulevard, go nearly straight north across Calvert Street, through the Regional Center property, across Van Dorn, and then angle northeast across South Street, joining the approved route just south of South Street, as shown on the map attached to the Addendum.

The Addendum refers to the route approved by the Secretary as the "East Line." It would go essentially north from the Highway 77 interchange, bend northwesterly just north of Van Dorn Street, and shave off about six acres of the west edge of Wilderness Park just south of Van Dorn Street (200 feet wide for about one-eighth mile). Although the Addendum also states that another twenty acres of parkland would be required at the south end of the park for either the East or the West route, that no longer is true. Testimony at the trial was that the lines would be moved far enough west to avoid the twenty acres.

The factors compared in the Addendum are six in number.

First, the Addendum states that the traffic projection by the Lincoln Area Transportation Study and the Resident Project Engineer of the consultants, Van Doren-Hazard-Stallings-Schnacke, indicates that 5,000 more cars per day would use the East Line than the West-Line. No sufficient attack has been launched on these studies to remove them as credible sources. The funneling of traffic from other roads onto the bypass, particularly to relieve 9th and 10th Streets, is a goal of the project. It is reasonable to conclude that moving of the bypass westward would tend to work toward that goal less than would putting it at the East Line, which is the approved route. The Addendum states the reasonable concomitant to that fact—the East Line means that 9th and 10th Streets would be less congested, safer, more open and accessible to police, ambulance and fire equipment.

Second, the Addendum says that patients at the Regional Center could be disturbed by the noise of heavy traffic nearby. It says that the Center's plans are to expand,

that the vacant land to the west of the Center's buildings is already in the airport glide pattern, and that the West-Line would add to the noise level. The Addendum attributed to the Acting Director of the Department of Public Institutions and the Director of the Lincoln Regional Center the suggestion that routing the bypass west of the Center would interfere with the safety and security of the patients. The plaintiffs presented evidence designed to cast doubt upon these statements. I am of the view that the concerns of two responsible officials in the mental health field were properly made a part of the Addendum for assessment by the Secretary, even in the absence of scientific study. The evidence at the trial was that no scientific studies were known to support a conclusion that highway noise adversely affects patient treatment. Assuming that to be accurate, I am not persuaded that the professional views of the persons directly responsible for the administration of the institution for mentally ill persons mean nothing; they properly can be taken into account; they were not presented in the Addendum as being the result of scientific study. The plaintiffs also argue that more study should have been made of the potential impact. I cannot tell from the evidence whether such a study reasonably could have been made; therefore, I cannot say that one should have been made. Furthermore, I note that the plaintiffs' expert, Dr. William D. Spalding, agreed that if he were an administrator of a mental hospital he would prefer for aesthetical, political, economic and safety reasons that a highway not be near his hospital.

Third, the Yankee Hill school district would be bisected by both the East Line and the West-Line. The Addendum pointed out that the West-Line would cut off approximately one-third of the present school enrollment and the East Line about ten per cent. The West-Line would cut off effectively the areas available for development of the school district, whereas the East Line would not, according to the Addendum. Safety concerns for those kindergarten-to-eighth-grade children attending were expressed by the president of the school board.

Fourth, the Addendum remarks that the West-Line would require removal of about one-half mile of pine trees along Van Dorn Street, trees which "frame" the entrance to Pioneers Park. The record supports that statement, whether it be considered of great or small significance.

Fifth, what is referred to as a more sentimental objection is made. The West-Line would be in the immediate vicinity of three cemeteries, one being a rural cemetery and the others being for inmates and workers at the Regional Center. Some 750 graves are in these three cemeteries, according to the Addendum.

Sixth, construction design problems are presented by the West-Line which are not presented by the East Line. Expert testimony supports the conclusion that an interchange at Pioneers Boulevard, where it curves to the southwest, would be undesirable from a safety standpoint. Mitigation, but not elimination, is possible through street alignment. Also, the Addendum states and expert testimony affirms that the West-Line's intersecting Van Dorn Street at a point where railroad tracks cross Van Dorn Street would require substantial elevation for clearance and a "non-standard interchange configuration" that could confuse the driver. Soil conditions—a flood plain and former presence of a lake—make engineering work more difficult.

Costs, the Addendum declares, would be about the same for the West-Line and the East Line.

#### (2) Southwest Sixth Street

Two slightly different alignments comprise the Southwest Sixth Street alternative. The first envisions the bypass right-of-way partly in and partly out of Wilderness Park, just south of Van Dorn Street. It would take seventeen single-family homes, two duplexes, and one commercial storage facility. The second would physically move the bypass slightly to the west, far enough to remove it from Wilderness

Park, and would result in the removal of thirty single-family homes, two duplexes, and two commercial establishments.[16]

The EIS/4(f) Statement goes on to say: " . . . [T]he sociological impact of destroying or breaking up an established neighborhood is a cost not to be overlooked. Although replacement housing may be available in the same general area, the neighborhood character and cohesiveness for those relocated would be lost. An additional complication is that if the alignment were run through those homes and businesses, severe interchange problems would result because of the need to connect with Van Dorn Street. Such an alignment would place the proposed facility closer to the Regional Center. This proximity to the Regional Center is not considered desirable from the standpoint of safety and would result in even greater sociological impact." Plaintiffs' Exhibit 1, p. 2–29

In the Appendix to the same statement, at A–14 and 15, appears this:

"Neighborhood—A small but established neighborhood is situated just to the west of Wilderness Park. This neighborhood is bounded on the north by Van Dorn Street, on the west by Folsom, and on the south approximately at Sherman Street. This compact community has been located there for several decades. There are many neighborhood social activities and family functions in which the populace may engage. Several extended families exist in this neighborhood. A study of the Lincoln City Directory and Census Tract information substantiates this finding. The statistics found in the Census Tract for Lincoln Standard Metropolitan Statistical Area also indicates that this is a middle class neighborhood with a median income of $10,545 and a median house value of $15,800. The effect of relocation of the neighborhood upon its residents would be enormous. (See Map No. 11)"

It is true that detailed sociological studies are not referenced and the investigation made of the area was less thorough than it could have been. But I am not persuaded that it was so deficient as to require rejection of the EIS/4(f) Statement. The comparison for EIS purposes was between one alternative (either version of the Southwest Sixth Street alternative) that physically took a minimum of seventeen houses, two duplexes and one commercial storage facility and another alternative that took no homes, duplex or commercial facilities. Substantial sociological impact of the former is obvious—precisely how much would be the hoped-for subject of any additional study.

Under these circumstances I hold that the EIS/4(f) Statement has not been shown to have been inadequate for the decisionmaker to rely upon in making a reasoned choice about the Southwest Sixth Street alternative.

*(3) East of Salt Creek*

This alternative is described at page 2–37 of the EIS/4(f) Statement as follows:

"The only other route avoiding this park land would be to the east of Salt Creek in the urban area of Lincoln as indicated on Map No. 17. Consideration was given to crossing Wilderness Park at the existing junction just south of Old Cheney Road and proceeding northerly along Salt Creek. The rapidly developing residential area, Salt Valley View, located west of 14th Street and north of Old Cheney Road, together with the extensive complex of railroad tracks to the north make this alternative highly expensive. In addition, Sawyer Snell Park, Sherman Field and Van Dorn Park lie to the north between 1st Street and 11th Streets, making this an undesirable location since the damage to developed park land would be extensive. Sawyer Snell Park serves a large neighborhood area and, in addition, provides winter recreation in the form of outdoor ice skating. Farther to the east lie a complex residential area and Van Dorn Park. This park contains playground and picnic facilities and serves a

16. Plaintiffs' Exhibit 1, p. 2–29.

large area. In addition, a number of railroad tracks pass through this area. These factors were considered highly unfavorable to the development of a highway facility in this area."

The evidence before the court confirms the statement just quoted and does not show that further information was needful to enable the Secretary to make a careful consideration of that alternative.

■ The plaintiffs have not carried their burden of showing that the EIS/4(f) Statement did not sufficiently describe and develop information about all reasonable alternatives or to enable the Secretary to make a finding as to feasible and prudent alternatives to the use of parkland.

### B. *Reasonableness of the Secretary's Decision*

For 4(f) purposes the inquiry is whether the Secretary's decision that there were no reasonable and prudent alternatives was necessarily arbitrary, capricious, an abuse of discretion or otherwise contrary to law, if based upon the administrative record before him.

■ As to the Southwest Sixth Street and East of Salt Creek alternatives, the Secretary was not at liberty to consider them as alternatives to the use of parkland under 4(f)(1), because they themselves would use parkland, as previously pointed out and as the EIS/4(f) Statement recites. I do not interpret the plaintiffs' attack as being that the Secretary could not reasonably decide under 4(f)(2) that the proposed alignment (the East Line) amounted to the least intrusive use of parkland, but if the plaintiffs do attack on that basis, I reject it, principally because in the balancing of factors, to the degree permitted by law, the taking of at least seventeen homes and two businesses provides ample reason to approve the line that was selected.

As to the West-Line, the description of it has been recounted in a preceding section of this memorandum of decision. The factors set out in Section I of this memorandum as being reasons for the Secretary's determin-

ing that the West-Line was not a feasible and prudent alternative are factors legitimately to be taken into account, except for the cost factor. Costs of the West-Line and the East Line are approximately the same.

The other six reasons were to be evaluated by the Secretary and a decision made as to whether they collectively resulted in the West-Line's not being a feasible and prudent alternative to the use of parkland. My role is to judge whether the Secretary's decision that they did amounted to an arbitrary or capricious act or an abuse of discretion or otherwise was contrary to law, if based upon the administrative record before him. I conclude that the Secretary's decision is supportable under that standard of review.

The West-Line's difficulties are genuine, according to the evidence. No expert testimony as to the West Line's being a feasible and prudent alternative to the taking of parkland was presented, except that of Raymond H. Hogrefe, Division Administrator of the Federal Highway Administration, a professionally licensed engineer. In his professional judgment the West-Line is not a feasible and prudent alternative to the taking of six acres of Wilderness Park. In expressing that opinion he considered the fact that the approved route took six acres of land off the corner of Wilderness Park, that the parkland taken will be replaced with similar land nearby and contiguous to the existing park, and that no constructed facilities for persons are affecting by the taking. He adjudged the combination of factors itemized in subsection A(1) of Section VI, rather than any individual factor, as constituting truly unusual factors.

The Secretary's finding that the West-Line is not a feasible and prudent alternative is entitled to a presumption of regularity. The administrative record before him carried sufficient data to support the decision he made. Local preferences, which the legislative history used as an example of factors not to be ignored, were expressed for the approved route by the State Highway Commission, the Governor, the City of

Lincoln, Lancaster County, and the Lincoln City Planning Commission.[17]

Reliance by the Secretary upon the factors listed in Section I of this memorandum, except for cost estimates, has not been shown to have been misplaced. The State Regional Center's objections were fairly expressed and were not without substance. The West-Line alternative would take travelers out of their way from the anticipated destination of most, thereby reducing the quality of service to the public. Design problems discussed herein in subsection A(1) of Section VI are considerable, in the judgment of the only professional engineer whose testimony is before me. Some aesthetic amenities of Pioneers Park, although minor, would be damaged. Noise and visual impact, although not extensive, on the State Regional Center would be there. That the impact on the Yankee Hill school district would be considerable is unassailable. The cumulative effect of these factors is a proper consideration.

The decision of the Secretary was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

A judgment will be entered for the defendants.

**17.** Plaintiffs' Exhibit 2, p. 1.